Mary Pat LAFFEY, et al., Plaintiffs,

v.

NORTHWEST AIRLINES, INC., Defendant.

Civ. A. No. 2111–70.

United States District Court, District of Columbia.

July 29, 1983.

As Corrected Aug. 4, 1983.

See also D.C. Cir., 642 F.2d 578.

Philip A. Lacovara, Hughes, Hubbard & Reed, Washington, D.C., for defendant.

Michael H. Gottesman, Bredhoff & Kaiser, Washington, D.C., for plaintiffs.

## MEMORANDUM OPINION

AUBREY E. ROBINSON, JR., Chief Judge.

### I. Introduction

This case is before the Court on Plaintiffs' application for an award of over $5 million in reasonable attorneys' fees pursuant to 42 U.S.C. § 2000e–5(k). The application is the most recent—although certainly not the final—stage of this protracted Title VII and Equal Pay Act litigation. The action has been an extraordinary undertaking in many respects, consuming thirteen years and thousands of personnel hours and raising numerous issues under both statutes. It was virtually inevitable that the action would culminate in an equally extraordinary fee petition.

The torturous history of this litigation need not be recounted in detail. It is sufficient to note that the saga began on July 15, 1970 with the filing of a complaint on behalf of a class of Defendant's female flight attendants; ten counts were brought under Title VII and four counts under the Equal Pay Act. In the ensuing thirteen years, the parties and their counsel committed their time, energies, and considerable legal skill to an extended period of pretrial discovery, a full trial on the merits, two rounds of appeals, and one *certiorari* petition. And the end is not yet in sight. The parties have appealed this Court's judgment of November 30, 1982 [1] and this Court fully

---

1. The Court's November 30, 1982 Order en- tered final judgment for Plaintiffs, incorporated

expects the disposition of Plaintiffs' fee application to follow the same course. This opinion clearly is not the final word in this litigation.

The fee application process began in earnest in June 1982. At that time, all other remand issues having been resolved or submitted to the Court for resolution, the Court entered an Order directing counsel to commence negotiations on the attorneys' fees and to report to the Court on the status of those discussions.[2] Bredhoff & Kaiser, the law firm that represented Plaintiffs throughout the entire litigation, had retained Daniel Rezneck of Arnold & Porter to negotiate and, if necessary, litigate the attorneys' fee award. Michael Gottesman, Plaintiffs' principal counsel and one of the senior partners at Bredhoff & Kaiser, explained that the firm believed the fee award could most effectively be pursued by a "dispassionate ... highly experienced litigator who was not so intimately involved in the *Laffey* case."

In November 1982, the parties advised the Court that their negotiation efforts had produced no accord and presented the Court with a proposed schedule for the orderly litigation of the attorneys' fee. The parties' timetable—approved by the Court on December 1, 1982—called for several months of discovery prior to submission of the formal fee petition. The discovery was undertaken and, following the Court's resolution of the disputes that arose during that process, Plaintiffs filed their Application for an Award of Attorneys' Fees and Expenses (hereinafter "Plaintiffs' Application") on March 22, 1983. This document was followed by (1) the Submission of Northwest Airlines, Inc., with Respect to Plaintiffs' Application for an Award of Attorneys' Fees and Expenses ("NWA Submission"); (2) Plaintiffs' Reply Brief in Support of the Application; (3) Defendant's Response to Plaintiffs' Reply Brief; (4) Plaintiffs' Supplemental Application for an Award of Attorneys' Fees and Expenses ("Supplemental Application"); (5) Defendant's Response to the Supplemental Application; and (6) Plaintiffs' Reply Brief in Support of the Supplemental Application; (7) Plaintiffs' Update to the Supplemental Application; and (8) Defendant's Response to Plaintiffs' Update. These submissions were accompanied by multiple volumes of appendices, exhibits, affidavits, charts, summaries, and the like. The result is a fee application covering all hours worked and expenses incurred from July 15, 1970 to July 15, 1983 and encompassing well over a thousand pages of material. It is the most extensive fee petition this Court has ever received.[3]

The following chart summarizes the amounts claimed by Plaintiffs for their counsels' fees and expenses and the amounts Defendant suggests are properly sought.[4] It is evident from this tabulation that the parties' view of the fee request is markedly dissimilar.

| BREDHOFF & KAISER | | AMOUNTS REQUESTED | NWA's PROPOSAL |
|---|---|---|---|
| Merits Issues | | | |
| Fees: | Lodestar | $ 1,494,450.80 | $ 903,875.15 |
| | 200% Adjustment | 2,988,901.60 | * |
| Expenses: | Paralegals/Clerks | 76,290.15 | 76,065.00 |
| | Disbursements | $ 101,183.84 | 29,390.04 |
| | Sub-Total: | $ 4,660,826.39 | $1,009,330.19 |

**2.** Defendant had expressed interest in beginning the fee negotiations in early 1978, after *certiorari* was denied, but the suggestion was rejected by the Court. In April 1978, after the mandate had issued from the Court of Appeals, this Court entered an order staying the provision of its 1974 order that directed the parties to proceed with the fee discussions.

the injunctive orders entered throughout the course of the litigation, and established the amounts of backpay due each of the 3,364 cabin attendants who was entitled to recover backpay—a total of approximately $52 million.

**3.** It is also one of the most hotly contested. Defendant rails against Plaintiffs' "extravagant and outlandish" submission and likens its reading of the application to a trip to the "Land of Oz."

**4.** These figures do not include 141.625 hours of Bredhoff & Kaiser attorney time and 77.75 hours of Arnold & Porter attorney time that were eliminated from the fee request in an exercise of "billing judgment."

| BREDHOFF & KAISER | AMOUNTS REQUESTED | NWA's PROPOSAL |
|---|---|---|
| **Attorney Fee Issues** | | |
| Fees: Lodestar | $ 193,481.27 | $ 39,240.63 |
| Expenses: Paralegals/Clerks | 27,529.50 | 9,244.50 |
| Disbursements | $ 4,960.32 | 608.81 |
| Sub-Total: | $ 225,971.09 | $ 49,093.94 |
| **ARNOLD & PORTER** | | |
| **Attorney Fee Issues** | | |
| Fees: Lodestar | $ 164,893.75 | $ 25,070.76 |
| Expenses: Paralegals/Clerks | 25,770.00 | 10,061.25 |
| Disbursements | $ 20,916.33 | 2,589.63 |
| Sub-Total: | $ 211,580.08 | $ 37,721.64 |
| TOTAL: | $ 5,098,377.56 | $1,096,145.77 |

\* Defendant does not specify the multiplier that would be appropriate, but suggests that it be limited to a "very modest" contingency increase.

The Court's assessment of these competing claims follows, as it must, the market value methodology adopted by the Court of Appeals in this Circuit: the number of hours reasonably devoted to the litigation is multiplied by the attorneys' reasonable hourly rates to arrive at the "lodestar" calculation. This sum then may be adjusted upward or downward to reflect the characteristics of the particular case (and counsel) for which the award is sought. *See Copeland v. Marshall ("Copeland")* 641 F.2d 880 (D.C.Cir.1980) (en banc); *National Association of Concerned Veterans v. Secretary of Defense ("Concerned Veterans")*, 675 F.2d 1319 (D.C.Cir.1982). Because many of the calculations mandated by this methodology are inherently imprecise and require certain estimates or approximations, the Court must exercise its discretion—soundly informed by its knowledge of the litigation before it and the experience it has acquired in numerous other cases—to arrive at the final fee award.

This Court has reviewed the *Laffey* fee application in all its exhaustive detail and concludes that the following award of attorneys' fees and costs constitutes a fair, reasonable and fully compensatory award.

## II. Number of Hours Reasonably Expended

■ The first component of any court-awarded attorneys' fee is the number of hours reasonably expended on the litigation. *Concerned Veterans,* 675 F.2d at 1323; *Copeland,* 641 F.2d at 891. Although a fee applicant is entitled to full compensation for his counsels' efforts, "[i]t does not follow that the amount of time *actually* expended is the amount of time *reasonably* expended." *Copeland,* 641 F.2d at 891. "Billing judgment" is an important element of fee setting, whether the fee is set in the private sector by an attorney, or is awarded by a court pursuant to a fee-shifting statute; in each instance, excessive or unproductive hours are excluded from the fee calculations. *Id. See also Hensley v. Eckerhart,* —— U.S. ——, ——–——, 103 S.Ct. 1933, 1937–1940, 76 L.Ed.2d 40 (1983).

■ The fee applicant bears a "heavy obligation" to document the number of hours devoted to the litigation. *Concerned Veterans,* 675 F.2d at 1323–1324. Although it is not necessary to know "the exact number of minutes spent nor the precise activity to which each hour was devoted," the fee application must contain sufficient detail to permit both the court and opposing counsel to conduct an informed appraisal of the merits of the application. *Id.* at 1327. Where the fee applicant has omitted nonproductive time from the fee request, the application should identify "the nature of the work and the number of hours involved." *Id.* at 1327–1328.

Plaintiffs have requested compensation for 13,932.25 hours of attorney time.[5] In support of that request, Plaintiffs have proffered extensive supporting documentation, including a day-by-day breakdown of the time spent during the past 13 years by each attorney on the case and a description of the hours that were excluded from the

---

**5.** The Court treats separately the hours devoted to the litigation by attorneys and those logged by paralegals and law clerks. Although all reasonable hours spent by paralegals and law clerks are compensated on the basis of an hourly rate—the same methodology employed for compensating attorneys—the parties have included these hours as part of the costs and expenses, rather than as part of the lodestar.

application in the exercise of "billing judgment."

Defendant does not contest the reasonableness of most of the hours Plaintiffs' counsel invested in this litigation—and with good reason. This Court's independent examination of the hours devoted to this action indicates that they are documented in accordance with the criteria set forth in *Concerned Veterans* [6] and, in most instances, were reasonably expended. There are, however, four categories of hours that Defendant challenges as unreasonable; the Court deals with each category of contested hours separately below.[7]

### A. The "Lost Issues"

Because Title VII authorizes an award of fees only to a "prevailing" party, 42 U.S.C. § 2000e–5(k), Defendant objects to an award of fees for the hours Plaintiffs' counsel spent preparing and litigating motions that were decided in Defendant's favor. Defendant originally identified six "lost issues" for which it contends compensation should be denied, but withdrew its challenge as to two issues following the Supreme Court's intervening decision in *Hensley v. Eckerhart*, —— U.S. ——, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Four issues and 254.25 attorney hours remain in dispute.[8]

This Court concurs in Defendant's assessment that *Hensley* is relevant to this dispute, but concludes that virtually all of the hours devoted to the so-called "lost issues" are fully compensable.

It is true, of course, that "no compensation should be paid for time spent litigating claims upon which the party seeking the fee did not ultimately prevail." *Copeland,* 641 F.2d at 891–892 (footnote omitted). The Court of Appeals has adopted a practical approach to this inquiry, however, *Concerned Veterans,* 675 F.2d at 1327 n. 13, and has admonished trial courts to apply the rule with care:

> ▮ sometimes will be the case that a lawsuit will seek recovery under a variety of legal theories complaining of essentially the same injury. A district judge must take care not to reduce a fee award arbitrarily simply because a plaintiff did not prevail under one or more of these legal theories. No reduction in fee is appropriate where the "issue was all part and parcel of one matter," but only when the claims asserted "are truly fractionable."

*Copeland,* 641 F.2d at 892 n. 18 (citations omitted).

---

**6.** The Court finds little evidence of the "severe deficiencies" in counsels' record-keeping and work descriptions to which Defendant alludes. NWA Submission at 45. A fee application need not recite "the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." *Copeland,* 641 F.2d at 891 (quoting *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 167 (3d Cir.1973)). It is sufficient if the application contains "detailed summaries based on contemporaneous time records indicating the work performed by each attorney for whom fees are sought." *Concerned Veterans,* 675 F.2d at 1327 (footnote omitted). Plaintiffs' application does so. The summaries of counsels' hours contain sufficient detail to permit this Court "to make an independent determination whether or not the hours claimed are justified." *Id.* No more is necessary.

**7.** *See Donnell v. United States,* 682 F.2d 240, 250 (D.C.Cir.1982) (where the opponent of a fee application raises specific and substantial questions about the number of hours worked, the court must state specifically why the claims lack merit).

**8.** Defendant continues to object to any award of compensation for time spent on (1) Plaintiffs' motion to have Defendant adjudged in contempt of this Court's 1974 remedial order for failing to equalize pay scales for male and female cabin attendants (80.75 attorney hours); (2) Plaintiffs' request to revise the rate of post-judgment interest in light of a new District of Columbia statute (98.75 attorney hours); (3) Plaintiffs' motion to determine the relevant filing date of the EEOC charge (15.5 attorney hours); and (4) Plaintiffs' two motions for reconsideration of this Court's ruling on the "pre-Act longevity" issue. (59.25 hours). (The Court's ruling was issued in response to Defendant's Request for Instructions and/or Clarification.) Defendant concedes that Plaintiffs are entitled to compensation for 8 hours they spent originally litigating the matter, but vigorously objects to footing the bill for Plaintiffs' efforts to persuade the Court to alter its ruling.

■ *Hensley v. Eckerhart* echoes and elaborates upon this theme.[9] In an opinion fortuitously issued in the midst of this fee litigation, the Supreme Court addressed (1) the standards that govern reduction of a fee award to account for issues on which the fee applicant did not prevail and (2) the relationship of the outcome of a case to an award of attorneys' fees. The Court concluded that when a fee applicant has succeeded on only some of its claims for relief, the scope of the fee award turns upon two questions:

> First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

—— U.S. at ——, 103 S.Ct. at 1940. If the claims for relief are unrelated, *i.e.,* based on different facts and legal theories, "counsels' work on one claim will be unrelated to his work on another claim" and no fee is awarded for time spent in pursuit of the unsuccessful claim. *Id.*

The Court acknowledged, however, that many cases contain only a single claim or present multiple claims for relief that involve a "common core of facts" or related legal theories. In such cases,

> [m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

*Id.* (citation omitted).

With the *Hensley* standards in mind, this Court has no difficulty concluding that the matters Defendant identifies as "lost issues" are not "distinct in all respects from [Plaintiffs'] successful claims." —— U.S. at ——, 103 S.Ct. at 1943. In fact, they flow directly from Plaintiffs' successful claims, for all of Plaintiffs' "lost" motions were attempts to define or broaden the scope of remedies for Defendant's proven wrongdoing. The Court's focus shifts, therefore, to the extent of Plaintiffs' success.

■ It is apparent that Plaintiffs' counsel obtained "excellent results."[10] Plaintiffs prevailed on every one of fourteen claims of violation and, although not every remedy they sought was awarded, they prevailed on the vast majority of remedial issues and obtained some of the most comprehensive monetary and injunctive relief ever awarded in an employment discrimination case. By any standard of measure, the relief awarded in this case is substantial—

---

9. Although Hensley involved a fee award under 42 U.S.C. § 1988, the Court noted that the standards it enunciated "are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" —— U.S. at —— n. 7, 103 S.Ct. at 1939 n. 7.

10. This finding is not inconsistent with the Court's refusal, in Part IV, *infra,* to increase the lodestar to account for counsels' exceptional performance and/or exceptional success. Under Hensley, a plaintiff is deemed to have achieved "excellent results" when he obtains substantial relief, as distinguished from "only partial or limited success." A quality adjustment, however, requires more than substantial relief in relation to the complaint as a whole; it requires a result that is "substantially better than could reasonably have been expected," given the hourly rates commanded and the number of hours expended. *Copeland,* 641 F.2d at 894; *Donnell,* 682 F.2d at 255, n. 51.

both in absolute terms and in comparison to the scope of the litigation and the number of hours expended. *Id.*

■ On the facts of this case, therefore, it would be inappropriate for this Court to reduce Plaintiffs' compensable hours because they did not prevail on a handful of relatively minor remedial issues.[11] Plaintiffs undeniably attained substantial relief on a series of closely related claims, and they "should not have [their] attorney[s'] fee reduced simply because the district court did not adopt each contention raised." *Hensley,* —— U.S. at ——, 103 S.Ct. at 1943.[12]

The Court notes, however, that 59.25 attorney hours devoted to the so-called "lost issues" are not compensable on other grounds, i.e., that they were not reasonably expended.

After this Court resolved the "pre-Act longevity" dispute in Defendant's favor, Plaintiffs sought reconsideration of the Court's order. They did so because their counsel "genuinely believed" that the Court's ruling misconstrued the cases on which it relied and because "they thought they could demonstrate this more clearly than they had" in their original memorandum. Gottesman Affidavit at 158. The Court denied the motion for reconsideration. Four months later, Plaintiffs filed a renewed motion for reconsideration, based upon a subsequent decision in the Tenth Circuit "that they believed supported the position that this Court had rejected in its prior rulings." *Id.* The Court denied this motion as well.

■ The Court acknowledges that a great deal of money was at stake in the longevity dispute and that the issue was fully deserving of the parties' time and energies. The Court acknowledges, too, the sincerity of counsels' belief that its ruling was unwise or erroneous. Counsels' convictions, however, do not justify repeated litigation of the issue. Both parties were afforded a full opportunity to brief the question prior to this Court's ruling. Plaintiffs' decision to invest an additional 59.25 attorney hours to reargue the matter was unreasonable and will not be sanctioned through an award of fees. The following deductions are appropriate:

| | |
|---|---|
| Gottesman | 43.875 hrs. (at $175/hr.) |
| Weinberg | 15.375 hrs. (at $150/hr.) |

### B. Gilbert Feldman's Hours

Among the mass of attorney hours for which Plaintiffs seek compensation are 160.5 hours logged by Gilbert Feldman immediately prior to and during the trial of this action. After noting that Feldman represented a class of flight attendants in a similar action against Trans World Airlines,[13] Defendant contends that none of his hours are compensable because (1) Feldman was not retained by Plaintiffs to represent them and (2) he observed the *Laffey* trial solely for the benefit of his own clients. The Court rejects Defendant's argument as factually inaccurate and inconsistent with the law in this Circuit.

■ The affidavits submitted by Michael Gottesman demonstrate that Feldman was

---

**11.** See *Lamphere v. Brown University,* 610 F.2d 46, 47 (1st Cir.1979) (fees may be awarded for time spent on good faith attempts to broaden the scope of remedies, even if unsuccessful). *See also Blake v. Hoston,* 513 F.Supp. 663, 665 (D.D.C.1981). In a case such as *Laffey,* where the law is unsettled and the parameters of remedial relief are unclear, it is incumbent upon counsel to pursue every reasonable avenue of relief to which their clients might be entitled. Such efforts should not be penalized by refusing attorneys' fees for them. Although Plaintiffs' motions were denied, the Court rejects Defendant's implicit suggestion that the motions were frivolous and motivated by counsels' "knowledge that the defendant probably

will be required to pay their fees." NWA's Submission at 46. The record simply does not support the assertion that Plaintiffs' counsel were "grasping at faint straws," or seeking to enhance their fee at Defendant's expense.

**12.** This Court's determination that attorney hours devoted to these issues are compensable applies with equal force to all reasonable hours spent by law clerks and paralegals on the same matters. See Part V–C, *infra.*

**13.** *Maguire v. TWA,* 535 F.Supp. 1283 (S.D.N. Y.1982), *aff'd mem.,* 722 F.2d 728 (2d Cir.1983).

more than a passive on-looker in this litigation; he performed a variety of legal services for Plaintiffs, including pre-trial preparation of witnesses, examination of a witness at trial, and "on-the-spot" counseling on questions that arose during trial. Feldman performed these services at Gottesman's request and pursuant to an oral agreement with Gottesman that he would serve as additional counsel for Plaintiffs at trial and that his time would be included in the fee claim if Plaintiffs prevailed.

The fact that Feldman was not formally retained by Plaintiffs and was not paid for his work is irrelevant; it does not obliterate the value of his services, nor does it require Plaintiffs to be compensated for his time at anything less than its full market value.[14] *See Jordan v. Department of Justice,* 691 F.2d 514, 523–524 (D.C.Cir.1982) (legal services performed by unpaid law students are compensated at the full market value of those services). Feldman's apparent litigation experience, combined with his independent knowledge of Defendant's employment practices (acquired by virtue of his union client's former representation of Defendant's cabin attendants) made it eminently reasonable for Gottesman to solicit his participation and assistance in the case. There is no suggestion or indication that Feldman's services were superfluous, and Plaintiffs accordingly are entitled to compensation for 160.5 hours of his time.[15]

### C. Allocation of Tasks Between Partners, Associates and Paralegals

Defendant contends that many tasks in this lawsuit "that could have been completed competently by an associate or paralegal were performed by attorneys seeking partner level compensation." NWA Submission at 56.[16] As a consequence, Defendant asserts that the allocation of tasks in the litigation was "highly inefficient"[17] and asks this Court to award fees based solely on the level of experience *necessary* to perform the services. Defendant does not

---

**14.** It is equally irrelevant that (1) Feldman's complaint against Trans World Airlines was patterned after the *Laffey* complaint, and (2) the experience he gained in Laffey ultimately may have redounded to the benefit of his *Maguire* clients. An attorney's knowledge is by nature cumulative; every case in which he participates expands his knowledge and thereby benefits, either directly or indirectly, future clients. It is absurd to suggest, however, that the attorney should receive no compensation—or should receive a reduced fee—to account for that "re-usable" knowledge. Attorneys do not discount their fees to reflect the experiential value of a case (although they may reduce their fee if inexperience in a particular area causes them to spend more time on a matter than is reasonable) and this Court is aware of no judicial decision suggesting that they should. This Court declines to be the first to announce such an astonishing result.

**15.** The hourly rate at which Feldman's time shall be compensated is discussed at Part III, *infra.*

**16.** For example, Defendant claims that Gottesman seeks an award of $175/hour for hundreds of hours devoted to "basic legal research" and "writing initial drafts of numerous briefs." NWA Submission at 56–57. Defendant concludes that those tasks *could* have been completed by an associate and therefore should be compensated at associate rates. More specifi-

cally, Defendant defines "legal research, preliminary drafting, [and] document review" as "associate work" and "filing, xeroxing, proofreading, digesting depositions, picking up or delivering pleadings, talking with class members or reporters after entry of judgment, etc." as "paralegal or administrative work." Other tasks that Defendant identifies as properly delegable include (1) computations performed by partners (instead of associates) in connection with "settlement analysis;" (2) compilation of trial exhibits (properly the work, Defendant contends, not of associates but of paralegals); and (3) travel time. With the exception of travel time, which Defendant contends should be compensated entirely as "paralegal/administrative" work, Defendant proposes compensating the "partner hours" devoted to these delegable tasks on the basis of a 60–40 ratio: 60% of the time spent on these matters is allocated to associate time, 40% allocated to partner time. Where associates have performed work that might have been performed in large part by paralegals, Defendant proposes a 50–50 allocation of the hours between associate and paralegal time.

**17.** In support of its assertion, Defendant proffers the affidavit of "law firm economic consultant" Lawrence Bright. Mr. Bright opined that the substantial involvement by partners Gottesman and Weinberg in research and drafting activities was "an inefficient way to handle the case."

challenge the *number* of hours expended; it suggests only that they be redistributed among the various levels of personnel and compensated at commensurately lower hourly rates.

■ Defendant's argument—including the opinion of its "efficiency expert"—is predicated on the erroneous assumption that there is a single, correct staffing pattern for every lawsuit, *viz.,* that plaintiffs' counsel have an obligation to perform legal work in a minimally competent way. This Court finds no support for this approach in either the case law in this Circuit, the interest of the attorneys' clients, or the goal which Defendant's methodology purports to serve: the efficient conduct of litigation. Indeed, depositions of several attorneys that were taken in connection with this fee litigation demonstrate that there are circumstances in which it is *more* efficient for partners to perform such tasks as research, drafting, and compilation of trial exhibits, than to assign the performance of these tasks to associates working under partners' supervision.[18]

This Court concludes that the allocation of responsibility between partners, associates and paralegals with respect to most tasks is a function of many variables and that there is no uniform approach that applies in all instances. "It is an inherent part of an attorney's task to determine

what types of expertise should be brought to bear on a legal problem," *Connors v. Drivers, Chauffeurs & Helpers Local Union 639,* C.A. 82–1840, slip op. at 15, (D.D.C. March 4, 1983) and "[a]bsent a clear misallocation of resources, this Court is unwilling to second-guess counsel's judgment." *Id.*[19]

■ This does not mean, however, that the Court will not exercise any oversight of counsels' staffing decisions. Although "plaintiffs are not required to assign, to any given task, the minimum amount of legal skill capable of accomplishing it . . . . time spent by attorneys on *non-legal work—e.g.* filing information, computing statistics, etc. —is not properly compensable at attorney's rates." *Ruiz v. Estelle,* 553 F.Supp. 567, 588 (S.D.Tex.1982) (emphasis added). The Court has reviewed the time summaries for each of the attorneys and concludes that a total of 35.55 hours were devoted to non-legal tasks.[20] These hours shall be compensated, as Defendant suggests, at the paralegal hourly rate of $30. All other hours, including those spent by attorneys in transit in connection with legal matters, shall be compensated at the attorneys' hourly rates established *infra.*

### D. Attorney Fee Litigation

Plaintiffs have requested compensation for 2,579 hours their counsel invested in the

---

**18.** *See* Deposition of William A. Carey, Defendant Exhibit 25 at 55–56, and Deposition of James A. Dobkin, Defendant Exhibit 26 at 30–31. Both attorneys indicated that, depending upon the nature of a particular case and the legal issues involved, a partner's greater legal expertise and/or familiarity with the facts might warrant more involvement by the partner in tasks that otherwise could be delegated to associates. *See also* Gottesman Affidavit at 15–19.

**19.** The Court perceives no misallocation as to most of the hours for which compensation is sought. The Court acknowledges the substantial participation by partners in virtually every phase of this litigation. (According to Defendant's calculations, partner time accounted for 64% of the attorney hours invested in the case.) In light of the complexity of the case, the novelty of the issues raised, and the caliber and tenacity of the defense, however, the Court does not find this allocation of tasks either surprising or inappropriate. Moreover, as not-

ed in Part IV, *infra,* counsels' extensive reliance upon the skill and experience of highly-compensated partners is one factor in this Court's refusal to adjust the lodestar to account for counsels' "exceptional" performance.

**20.** The following hours (and the hourly rates that apply to them) shall be deleted from Plaintiffs' compensable total:

| | | | |
|---|---|---|---|
| Gottesman: | 6.125 | hrs. | (at $ 150) |
| | 12.675 | hrs. | (at $ 175) |
| Cohen: | 1.0 | hrs. | (at $ 175) |
| Weinberg: | 2.0 | hrs. | (at $ 100) |
| | 4.25 | hrs. | (at $ 150) |
| Petramalo: | .25 | hrs. | (at $ 100) |
| | 5.0 | hrs. | (at $ 125) |
| D. Clark: | 1.0 | hrs. | (at $ 75) |
| | 1.25 | hrs. | (at $ 100) |
| Collins: | 2.0 | hrs. | (at $ 100) |

negotiation and litigation of the attorneys' fee award. They assert that this enormous expenditure of time was necessitated by (1) the complexity of the fee application; (2) the *Concerned Veterans* requirement for extensive, detailed documentation; and (3) "the stubbornness with which NWA has fought the fee issue, its heavy discovery demands on plaintiffs, its resistance to any discovery by plaintiffs on the fee issue, and the length and breadth of its own submission in response to the fee application." Plaintiffs' Reply Brief at 59.

■ Defendant does not challenge the principle that time reasonably expended by both Bredhoff & Kaiser and Arnold & Porter pursuing the fee request is compensable,[21] but vigorously opposes an investment of over 2,500 attorney hours as extravagant, excessive and—especially where the entitlement to a fee is not in dispute—utterly unreasonable.[22] In addition, Defendant identifies three categories of counsels' endeavor that it contends are entirely noncompensable: time spent preparing and compiling affidavits in support of the fee application; time spent on conferences between Bredhoff & Kaiser and Arnold & Porter attorneys in connection with the fee negotiations and litigation; and time spent on discovery directed to the fee issue.[23]

The Court addresses each of Defendant's contentions separately below.

### 1. The Affidavits

The record Plaintiffs amassed to document their fee request includes thirty-six affidavits. Two of the documents were prepared by Michael Gottesman, Plaintiffs' principal counsel on the merits, and another three by Daniel Rezneck, principal counsel on the fee petition; most of the remaining affidavits were culled from an impressive array of legal personages.[24] Plaintiffs assert that this barrage of affidavits is necessary in order to carry their "heavy burden" to document each element of the fee claim. Defendant asserts that the entire compendium of affidavits is superfluous, since this Court can glean enough information from its knowledge of the case and first-hand observation of counsel and from attorney affidavits placed in the public record in other fee applications to assess the reasonableness of the fee.[25] Defendant urges that approximately 130 hours devoted to the affidavits be excluded from Plaintiffs' compensable hours.

Michael Gottesman spent 191.25 hours preparing a detailed affidavit reciting, *inter alia,* the history of the litigation, the legal and factual problems posed by the case, and his assessment of the risks associated with the action.[26] Defendant objects to under-

---

**21.** It is well settled that hours reasonably devoted to negotiating and/or litigating a statutory fee award are compensable. *See Copeland,* 641 F.2d at 896 and n. 29, 901; *Environmental Defense Fund v. Environmental Protection Agency,* 672 F.2d 42, 62 (D.C.Cir.1982). Moreover, where outside counsel have appeared on behalf of trial counsel on the attorneys' fee issue, the Court of Appeals has approved compensation for time reasonably expended by both firms. *See EDF v. EPA,* 672 F.2d at 63. *But see Shadis v. Beal,* 703 F.2d 71 (3d Cir. 1983).

**22.** Defendant notes that the number of "professional hours" (i.e., attorney, law clerk, and paralegal hours) devoted to the fee issue is the equivalent of more than 30% of all professional time devoted · to the merits of the litigation.

**23.** Defendant concludes that only 930.125 attorney hours are compensable.

**24.** The affidavits attest, *inter alia,* to the actual rates charged by lawyers at some of the most

prestigious law firms in Washington, D.C.; the general complexity of employment discrimination cases; the complexity and significance of *Laffey;* and the experience, expertise and sterling reputation of Plaintiffs' counsel.

**25.** For example, Defendant contends that "[t]his Court ... has had ample exposure to Mr. Gottesman's work, and hardly needed to be treated to fourteen attestations to its quality." NWA Submission at 91. Defendant also points out that "[t]his Court knows the degree of complexity of this litigation at first hand. Nothing is gained by soliciting strangers to the case to inject their opinions about its complexity." *Id.* at 90.

**26.** It appears that Defendant objects only to Gottesman's first affidavit. See NWA Response to Supplemental Application at 7.

writing "counsel's memoirs" on the ground that "[t]he Court, which has presided over this litigation from its commencement, surely needed no discursive recapitulation of the proceedings." NWA Submission at 97. To the extent that the affidavit contains arguments that were incorporated into the fee application, Defendant contends that the affidavit was "completely unnecessary and unwarranted."

■ This Court cannot accept Defendant's contention that Gottesman's affidavit was no more than a self-serving, auto-biographical exercise. The Court of Appeals implicitly has acknowledged the usefulness of affidavits from counsel. *See Environmental Defense Fund v. Environmental Protection Agency,* 672 F.2d 42, 54 (D.C.Cir. 1982). Indeed, given plaintiffs' "heavy obligation to present well-documented claims," *Concerned Veterans,* 675 F.2d at 1323–24, and, in particular, to set forth the specific aspects of the case that justify the lodestar adjustments they seek, *id.* at 1328–29, such affidavits may well be an indispensable component of many fee applications.

It is true, of course, that this Court has developed considerable familiarity with this case during the past thirteen years and that this knowledge is useful in assessing the fee request. *See Copeland,* 641 F.2d at 893, n. 24 and 901. *See also Hensley v. Eckerhart,* —— U.S. at ——, 103 S.Ct. at 1942. However, the Court's experience and memory do not substitute for a carefully prepared, fully documented fee request. It can be presumed that, in nearly every action, the judge presiding over the fee application shepherded the case through its earlier

stages and is acquainted with counsel and the course of the litigation. If the Court of Appeals had intended the Court's first-hand observation to substitute for a well-documented fee application, it would not have stressed repeatedly the necessity for Plaintiffs to produce specific evidence in support of the various elements of the fee award.

The Court acknowledges that Gottesman's affidavit is lengthy but finds no fault in this. The following passage from *Copeland* is particularly apt:

> This chronicle is necessarily lengthy because the lawsuit involved numerous and complex proceedings and maneuverings.... [T]he very intricacy of the litigation—which was a product, in part, of the [defendant's] vigorous and long-continued resistance to the claim asserted against it—is highly relevant to the reasonableness of the fee award.

641 F.2d at 884. The Court declines to omit any of the hours devoted to Gottesman's affidavits from the compensable total.

■ The Court reaches a different conclusion, however, as to the other supporting affidavits appended to Plaintiffs' fee application. It is impossible to single out particular affidavits as superfluous or duplicative. *Cf. Copeland,* 641 F.2d at 903. But after reviewing Plaintiffs' copious submissions, the Court is left with the firm impression that, in their eagerness to compile a thorough application, Plaintiffs' counsel have indulged in some "litigious overkill."[27] This Court does not suggest that fee applicants must document their requests at the most minimally acceptable level. The Court only concludes that the record before it clearly is far more extensive than is nec-

---

27. *Cf.* the following colloquy between the Court and Plaintiffs' counsel at a February 18, 1983 hearing on the parties' discovery disputes:

Mr. Rezneck:

... One of the reasons why I think this discovery is necessary is that it will give the Court a full record and, therefore, diminish the possibility of [a] remand. That is certainly one of our objectives here, to put in everything that we can.

The Court:

No, not everything that you can. That is just what I have tried to tell you. It is not everything that you can; it is everything that you need to substantiate your claim under the law as it presently exists. That is all I want. And the only discovery I am going to permit in this case on the fees question is the discovery that is needed, not the discovery that could be helpful—that is needed to discharge your burden under *Concerned Veterans.*

essary or desirable,[28] even for a fee request of this magnitude.

Defendants must compensate Plaintiffs for their counsels' efforts in litigating the attorneys' fee, but they do not have to pay for unreasonable or excessive endeavor. Accordingly, 72.25 attorney hours will be subtracted from Plaintiff's proposed lodestar totals, as follows:

| | |
|---|---|
| Bredhoff | 1.25 hrs. (at $175/hr.) |
| Gottesman | 8.5 hrs. (at $175/hr.) |
| Weinberg | 6.0 hrs. (at $150/hr.) |
| Brudney | .5 hr. (at $100/hr.) |
| Rezneck | 40.00 hrs. (at $175/hr.) |
| Burt | 6.0 hrs. (at $150/hr.) |
| Lindon | 10.0 hrs. (at $ 75/hr.) |

### 2. Inter-firm Meetings

Defendant challenges Plaintiffs' request for compensation for approximately 245 hours that lawyers from Bredhoff & Kaiser and Arnold & Porter spent in conference with one another. Defendant pronounces the conference time a "staggering" sum and argues that, because it was necessitated solely by Bredhoff & Kaiser's decision to retain separate counsel to prosecute their fee claim, none of the offending hours are compensable.

 The Court declines to pass judgment on the propriety of Bredhoff & Kaiser's decision to retain separate fee counsel; it leaves to counsel the professional judgment as to how its fee application is most effectively prepared. Counsel is not free, however, to exercise its judgment in a fashion that unnecessarily inflates the losing party's fee liability, e.g. by injecting an additional layer of attorneys into the case. Thus, hours that would not have been expended by an attorney (or law firm) prosecuting its own petition for fees cannot be charged to its opponent when separate counsel is brought into the case to pursue the fee award. Such hours are not "reasonably necessary to obtaining a fee award"

Transcript of Proceedings at 75.

**28.** "It ... is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps even dwarfing the case in chief." *Copeland,* 641 F.2d at 896 (quoting *Lindy Bros. Builders, Inc. v. American Radiator*

and are properly disallowed. *See Shadis v. Beal,* 703 F.2d 71 at 73 (3d Cir.1983).

The Court, however, does not adopt Defendant's suggestion that *all* hours devoted to inter-firm meetings be eliminated from the compensable total. If Bredhoff & Kaiser had prepared the fee petition itself, its own attorneys would have committed considerable time to intra-firm conferences to plot their application strategy and to allocate tasks; such expenditures of time would be neither startling nor improper. The Court therefore has estimated the amount of time such conferences would have consumed and subtracts all hours in excess of that amount from Plaintiffs' lodestar figures, as follows:

| | |
|---|---|
| Rezneck | 60.0 hrs. |
| Burt | 15.0 hrs. |
| Lindon | 50.0 hrs. |

### 3. Attorney Fee Discovery

 Defendant asks the Court to deny compensation for all hours devoted to discovery in connection with the attorney fee application. The disputed time includes 307.875 hours spent on "offensive" discovery requests (i.e., discovery sought by Plaintiffs from Defendant) and 389.5 hours spent on "defensive" discovery (i.e., Plaintiffs' responses to Defendant's discovery requests and motions). Defendant contends (1) that it was an unwilling participant in the pre-application discovery; (2) that none of the information requested of it was "really necessary for preparation of the fee application," and (3) that the information Plaintiffs' counsel gathered in "defensive" discovery was equally unnecessary. The Court finds Defendant's arguments almost wholly without merit.

The discovery to which Defendant objects occurred as a result of a stipulation between the parties. *See* Stipulation and Order Regarding Scheduling, December 1, 1982. Defendant joined with Plaintiffs in

*& Standard Sanitary Corp.,* 540 F.2d 102, 116 (3d Cir.1976)). *See also Hensley v. Eckerhart,* —— U.S. at ——, 103 S.Ct. at 1941: "A request for attorney's fees should not result in a second major litigation."

presenting the Court with an agreed-upon schedule for pre-application discovery. Defendant was under no obligation to enter into the agreement, and the Court approved the proposed schedule without protest from Defendant. Thereafter, Defendant fully participated in the discovery process, requested and obtained substantial information from Plaintiffs, and incorporated the material in its opposition to the fee application. The Court is astounded that Defendant now suggests the discovery was wholly unnecessary—including its own discovery requests!—and completely uncompensable. Defendant's position is even more unfathomable in light of its suggestion (in connection with a dispute that arose during the now-discredited discovery) that Plaintiffs

> had an obligation to collect that information, separate and apart from any discovery requests, to "document" their fee application.

Reply Memorandum in Support of Defendant's Motion to Compel, January 26, 1983 at 3. If the information collected and provided Defendant during the discovery process was necessary for Plaintiffs' fee application, the reasonable time spent assembling it is fully compensable.

With regard to the "offensive" discovery, the Court concludes that Plaintiffs' discovery requests—although broad—were not frivolous, but were *bona fide* efforts to advance Plaintiffs' legitimate litigation interests. The time devoted to them is also compensable.[29]

The Court acknowledges that the mutual pre-application discovery did not prove to be as helpful as it had hoped; for example, it does not appear to have eliminated (or even appreciably narrowed) the areas of controversy in the fee application. Nevertheless, the parties embarked on the discovery in good faith, with the full approval of the Court, and they are entitled to compensation for the hours they reasonably devoted to the task.

### 4. Reasonable Hours

Apart from the disputed hours devoted to the tasks addressed *supra,* Defendant asserts that preparation of Plaintiffs' fee application was characterized by "massive overkill," "inefficiency," and "extraordinary duplication of effort." Defendant attributes these flaws largely to Bredhoff & Kaiser's decision to retain separate counsel to pursue the attorneys' fee and contends that any hours expended by outside counsel beyond those that would have been required of counsel to prepare its own fee petition cannot be shifted to Defendant. Defendant proposes reducing by one-half the hours spent drafting and editing the fee applications in order to compensate for counsels' "inefficiency." Plaintiffs acknowledge that some duplication of effort may have been caused by securing new counsel for the fee application, but note that they eliminated approximately 200 attorney hours from the fee request to account for that possibility.

Although Plaintiffs' counsel dedicated more time to preparing the fee application than this Court can countenance, it does not appear that they were as wide of the mark as Defendant suggests. This litigation encompassed thirteen years, thousands of personnel hours, and thousands of dollars of out-of-pocket expenditures. Given the extensive documentation requirements in this Circuit, it was inevitable that the application would entail a substantial commitment of time. Defendant's unyielding stance only increased the hours necessary to litigate the fee request. This Court does not fault Defendant for defending itself tenaciously but finds that, having vigorously contested the attorneys' fee issue, it is scarcely in a position to complain that Plaintiffs responded in kind. *See Copeland,* 641 F.2d at 904 and n. 53.

Nevertheless, the Court has reviewed the time records that detail the attorney hours spent litigating the fee request (as well as the resulting written submissions) and concludes that the following hours were unnec-

---

**29.** Defendant asserts that because discovery work is properly the task of associates or paralegals, any compensable hours expended by partners should be compensated at the lower hourly rates applicable to these personnel. The Court is not persuaded. *See* Part II–C, *supra.*

essary, duplicative, or otherwise unreasonably spent:

| | | |
|---|---|---|
| Bredhoff | 1.25 | hrs. |
| Cohen | 2.00 | hrs. |
| Gottesman | 60.00 | hrs. |
| Weinberg | 57.25 | hrs. |
| P. Clark | 2.25 | hrs. |
| Brudney | 10.00 | hrs. (at $75/hr.) |
| Rezneck | 39.125 | hrs. |
| Burt | 22.00 | hrs. |
| Lindon | 72.125 | hrs. |

### E. Total Compensable Hours

The following table indicates the total number of hours for which compensation shall be awarded.

| | Merit Hours | Attorney Fee Hours |
|---|---|---|
| Bredhoff | -- | 10.75 |
| Feldman | 160.5 | -- |
| Cohen | 42.5 | 12.00 |
| Gottesman | 5,471.45 | 596.25 |
| Weinberg | 1,116.25 | 357.875 |
| Petramalo | 373.375 | 2.0 |
| D. Clark | 2,454.25 | -- |
| P. Clark | 698.25 | 12.125 |
| Collins | 817.0 | 10.5 |
| Gilson | 53 | 2.625 |
| Brudney | 76.375 | 63.125 |
| Rezneck | -- | 371.875 |
| Burt | -- | 116.00 |
| Lindon | -- | 556.125 |

### III. The Reasonable Hourly Rate

■ The second step—and the "key issue"—in establishing the lodestar is to determine the reasonable hourly rate "prevailing in the community for similar work." *Copeland*, 641 F.2d at 892; *Concerned Veterans*, 675 F.2d at 1324. The hourly rate generally depends upon the attorneys' experience and reputation, the type of work involved,[30] and the level of skill necessary to conduct the case. *Concerned Veterans*, 675 F.2d at 1325. Other relevant considerations include the time limitations imposed by the case, the amount to be obtained in the litigation, and the undesirability of the case. *Copeland*, 641 F.2d at 892; *EDF v. EPA*, 672 F.2d at 58.

Although the complexity of the market for legal services and the diversity of attorneys' billing techniques complicate the inquiry, a court must ascertain the prevailing hourly rate "with a fair degree of accuracy." *Concerned Veterans*, 675 F.2d at 1325. A fee applicant therefore must provide "specific evidence of the prevailing community rate for the type of work for which he seeks an award." *Id.*

Plaintiffs propose the following matrix of hourly rates for lawyers of differing levels of experience:

—$175 an hour for very experienced federal court litigators, *i.e.*, lawyers in their 20th year or more after graduation from law school;

—$150 an hour for experienced federal court litigators in their 11th through 19th years after law school graduation;

—$125 an hour for experienced federal court litigators in their 8th through 10th years after graduation from law school;

—$100 an hour for senior associates, *i.e.*, 4 to 7 years after graduation from law school; and

—$75 an hour for junior associates, *i.e.*, 1 to 3 years after law school graduation.[31]

They support their request with a barrage of data, including twenty-five attorney affidavits secured specifically for this

---

**30.** By "type of work" the Court refers not to an attorney's "in-court" vs. "out-of-court" time but to the substantive legal issues raised in the case. *EDF v. EPA*, 672 F.2d at 59.

**31.** Many of the lawyers for whom compensation is sought fell into more than one of these categories over the course of this litigation. Although Plaintiffs request an award of current hourly rates for all hours devoted to the action since its inception, see Part IV–C, *infra*, they do not suggest that each lawyer be compensated for the entire period at the highest rate category he or she reached during the period. Rather, Plaintiffs request the Court to award the current rates applicable to each level of experience the individual lawyers had attained when the work for which compensation is sought was performed.

litigation, information gleaned from affidavits filed in other cases, and fee data reflected in previous judicial decisions.[32] Plaintiffs contend that this documentation establishes that (1) these are the prevailing rates in the community for lawyers of comparable skill, expertise and reputation in complex federal litigation [33] and (2) the prevailing community practice is to charge fee-paying clients in employment discrimination cases the same rates that apply to other complex federal litigation.

Defendant does not dispute the high quality of legal services rendered in this case; indeed, it acknowledges counsels' "prominence and ability" and concedes that Bredhoff & Kaiser is "one of the 'premier' employment discrimination firms in the country." Defendant also does not challenge Plaintiffs' proposed matrix as an accurate depiction of the prevailing market rates for lawyers of comparable skill and ability who represent defendants in complex Title VII cases. Finally, Defendant acknowledges that the rates Plaintiffs' counsel charge fee-paying clients are not a function of the intrinsic value of the firm's legal services but rather of the particular clients the firm chooses to represent and their ability to pay. Despite this seemingly broad accord, Defendant vigorously objects to the hourly rates set forth in Plaintiffs' application.

The focus of Defendant's opposition is the fact that the rates Plaintiffs seek are higher than any hourly rate at which their counsel has ever billed its regular fee-paying clients. For purposes of a court-awarded fee, Defendant contends there is a distinction—purportedly fashioned in *Copeland*—between private lawyers with regular fee-paying clients and "public interest" lawyers who toil at modest salaries for non-profit legal defense funds or charitable organizations. According to Defendant's scheme, attorneys in the former category receive only the regular hourly rates charged to their fee-paying clients; there is no need to look beyond those rates or to "construct" a market rate, since "the market has already placed a value on the firm's services" in the form of its regular hourly rates.[34] Public interest lawyers, however, have no billing practice, and the Court therefore *must* construct a hypothetical market value for their services based upon the prevailing market rate.[35] On the basis

---

**32.** Each of these methods of proof was approved in *Concerned Veterans.* 675 F.2d at 1325–27.

**33.** Indeed, Plaintiffs assert that "the evidence we have developed indicates that, as reflections of the prevailing market rates in the community for complex federal litigation, the rates stated in the matrix are conservative." Plaintiffs' Application at 93.

**34.** Defendant argues, in effect, that every private, fee-charging law firm is a unique market, whose market price (and compensable hourly rate) is determined "by the forces of the economic market in the same way that the value of other goods and services is determined." NWA Submission at 10. Thus, Defendant asserts that

[i]t is ... illusory to attempt to establish an abstract "market rate" for a particular kind of legal services divorced from what a specific firm actually charges for performing these services. The rate actually charged by Bredhoff & Kaiser is a "market" rate for this purpose, *i.e.,* a price determined by the supply and demand factors affecting the type of service involved, including the experience of the persons performing the task, the type of

legal work being performed, the amount that clients are able and willing to pay for the legal work, and the costs of providing the services.

*Id.* at 20. However consistent this may be with the economic theory propounded by Defendant's experts, it is flatly inconsistent with the market value methodology outlined in Copeland. The Court of Appeals has held repeatedly and unambiguously that fee awards are based upon the rate that prevails *in the community* for the type of work involved; an attorney's actual earnings may shed light on the prevailing rate but they are not determinative. If this approach is "illusory," it falls to the Court of Appeals—not this Court—to dispel the illusion.

**35.** Defendant evidently fails to grasp the rationale for inquiring into the market value of a *public interest lawyers' time. The difficulty* with public interest attorneys is not that they have no earnings set by the "supply and demand factors" of the free market from which to determine their value; it is simply that their clients pay an artificially low price for their services and therefore their earnings simply do not reflect the *actual* value of their services.

of this dichotomy, Defendant asserts that Plaintiffs' counsel should be awarded no more than the regular hourly rates they charge their fee-paying clients.

The approach Defendant outlines finds no support either in logic or in the case law in this jurisdiction; in fact, adherence to Defendant's methodology would require a wholesale repudiation of the principles enunciated in *Copeland.* This Court has neither the authority nor the inclination to embark on such a path.

█ Although an attorney's actual billing rate is "highly relevant proof of the prevailing community rate," *Concerned Veterans,* 675 F.2d at 1326, it is clear that a court's fee setting inquiry does not begin and end with counsels' monthly billing statements. The Court of Appeals has indicated on numerous occasions that lawyers may receive court-awarded fees based upon rates that differ from those they normally command and has placed its imprimatur on awards far in excess of an attorney's salary or hourly rates. This result is not undesirable, but is a natural consequence of the Court of Appeals' decision to base attorney fee awards on the prevailing rate in the community for similar legal services:

> [F]ee allowances are basically to be measured by the market value of the services rendered, not the amount actually received by the attorney nor the amount that would have been received absent an award of fees.

*Jordan v. Department of Justice,* 691 F.2d at 523–524 (footnotes omitted). There is no room in this "market value" approach for the distinction Defendant attempts to create here.

The Court of Appeals noted specifically in *Copeland* that computing fees "differently depending on the identity of the successful plaintiffs' attorney"—i.e., whether counsel was a public interest firm or a private attorney—would produce results that are inconsistent with the legislative scheme of the Civil Rights Act of 1964:

The incentive to employers not to discriminate is reduced if diminished fee awards are assessed when discrimination is established. Moreover, where a public interest law firm serves as plaintiff's counsel (*a law firm that ... will not obtain the full value of its services* from the losing defendant) the defendant will be subject to a lesser incentive to settle a suit without litigation than would be the case if a high-priced private firm undertook plaintiff's representation.

641 F.2d at 899 (emphasis added).

This reasoning applies equally to lawyers in private firms (such as Plaintiffs' counsel) who scale their rates according to their clients' ability to pay and lawyers in nonprofit public interest organizations, whose rates are similarly (albeit more drastically) reduced to reflect the financial constraints of their clientele. The issue is not whether counsel is a "true" public interest firm that represents its clients "for low fees or for no fee at all." The question is whether the attorneys' regular rates reflect the actual market value of their services. Thus, where counsels' customary fees are not "low" in an absolute sense but are nevertheless below those that prevail in the market for similar services, a court contemplating a fee award is not limited to counsels' historic fees but must frame an award that reflects the true value of the services rendered.[36]

To be sure, the evidence presented to the court to establish the prevailing rate may vary according to the nature of counsels' practice. Thus, attorneys who have a regular billing practice submit evidence of their average hourly rates, since this data constitutes "important substantiating evidence of the prevailing community rate." *Concerned Veterans,* 675 F.2d at 1326 (footnote omitted). On the other hand, attorneys who do not receive fees or who have no regular billing practice (e.g., they depend upon court-awarded fees for the bulk of their remuneration) need not submit evi-

---

**36.** "It is *obvious* that where counsel customarily exercises billing judgment by not billing at the market rate ... this fact *must be* con-sidered in calculating counsel's true billing rate." *Concerned Veterans,* 675 F.2d at 1326 (emphasis added).

dence of either their hourly rates or their salaries. *Id.* at n. 7a. In each instance, however, the underlying factual inquiry is the same: "The court . . . must ultimately determine, on the evidence before it, the rate prevailing in the community for similar legal work." *Jordan v. Department of Justice,* 691 F.2d at 521.

Defendant maintains, however, that compensating counsel at rates above their regular, established fees is inconsistent with the policies underlying fee-shifting statutes. It correctly observes that one of the purposes of Title VII fee awards is to provide an incentive for competent lawyers to undertake Title VII work by assuring them of adequate compensation for their efforts. *Copeland* 641 F.2d at 890. Defendant contends that awarding attorneys their regular hourly rates (adjusted to current value) is sufficient economic incentive for them to accept Title VII cases; indeed, it cautions that awarding fees in excess of counsels' customary rates would over-compensate their efforts and bestow on plaintiffs a wind-fall at defendants' expense.

This argument was raised and soundly rejected in *Copeland.* After repudiating a "cost-plus" fee-setting methodology in favor of a market value approach, the *en banc* Court acknowledged that "paying low-salaried attorneys the prevailing market rate normally will yield a larger fee than that to which they are accustomed." 641 F.2d at 899. The Court concluded, however, that this result was not inappropriate since payment of "full fees" under the market value methodology was not only consistent with Congress' intent but would provide greater incentives to the private enforcement of Title VII. Indeed, the Court observed that "comput[ing] fees differently depending on the identity of the successful plaintiff's attorney might result in . . . windfalls to defendants." *Id.* This rationale retains its vitality whether plaintiff's counsel is a public interest law firm in the traditional sense or a private fee-charging firm whose customary rates—for whatever reason—do not reflect the full value of its services. The approach mandated by *Copeland*—and the approach this Court fully intends to fol-

low—ensures that, regardless of the nature of the law firm representing plaintiff, counsel will be compensated at rates that accurately reflect the full market value of their counsels' services.

The Court finds that the relevant legal market in this action is complex employment discrimination litigation and that this market is subject to the same hourly rates that prevail in other complex federal litigation. The Court rejects Defendant's suggestion that there are separate markets (and therefore separate prevailing rates) for the defense and prosecution of Title VII actions. The inquiry mandated by *Copeland* and its progeny focuses on the type of work performed, not on the identity of the client. The skill required to litigate a complex employment discrimination action does not vary with the attorneys' client, for each side litigates the same issues and grapples with the same underlying facts.

The Court also rejects Defendant's suggestion that, because Plaintiffs' counsel is a "union-oriented labor law firm," its rates for litigating this action should be determined by the market for legal services "in the recognized 'labor law' specialty." NWA Submission at 20–21. The Court reiterates that the appropriate benchmark for a fee award is the prevailing rate for "the type of work for which [the fee applicant] seeks an award," 675 F.2d at 1325, not the type of work it usually performs. Defendant's comparison of counsels' actual hourly rates with the rates of other labor law firms of similar size simply misses the mark.

The Court finds further that the hourly rates proposed by Plaintiffs are within the range of rates that prevail in the Washington, D.C. area for lawyers of comparable qualifications who handle cases of this sort. The Court acknowledges that these rates are generous. However, Plaintiffs have submitted a host of affidavits attesting to the extraordinary experience and expertise of Plaintiffs' counsel in this field; these affidavits only confirm what this Court observed firsthand during the

course of this lengthy litigation. Plaintiffs also submitted affidavits indicating that lawyers with comparable qualifications and expertise actually bill their clients—and receive remuneration—in cases of this sort at rates that are similar to (and, in some instances, higher than) the hourly rates Plaintiffs propose. In short, the Court concludes that the record in this action contains ample evidence that the rates Plaintiffs request are those that prevail in the community for similar work.[37] Defendant made no effort to produce "specific contrary evidence" that these rates are erroneous. *See Concerned Veterans,* 675 F.2d at 1326. The lodestar rates therefore are as follows:

| Attorney | Hourly Rates/ Years Worked | |
|---|---|---|
| BREDHOFF & KAISER: | | |
| Bredhoff | $175 | (1981 – Present) |
| Feldman | $100 | (1972) |
| Cohen | $150 | (1970 – May 31, 1976) |
| | $175 | (June 1, 1976 – Present) |
| Gottesman | $150 | (1970 – May 31, 1978) |
| | $175 | (June 1, 1976 – Present) |
| Weinberg | $100 | (January 1 – May 31, 1975) |
| | $125 | (June 1, 1975 – May 31, 1978) |
| | $150 | (June 1, 1978 – Present) |
| Petramalo | $100 | (1974 – May 31, 1976) |
| | $125 | (June 1, 1976 – May 31, 1979) |
| | $150 | (June 1, 1979 – Present) |
| D. Clark | $ 75 | (1970 – May 31, 1973) |
| | $100 | (June 1, 1973 – 1975) |
| P. Clark | $100 | (1977 – May 31, 1975) |
| | $125 | (1977 – May 31, 1980) |
| Collins | $ 75 | (1977 – May 31, 1979) |
| | $100 | (June 1, 1979 – Present) |
| Gilson | $100 | (1980 – Present) |

| Attorney | Hourly Rates/ Years Worked | |
|---|---|---|
| Brudney | $ 75 | (1981 – May 31, 1982) |
| | $100 | (June 1, 1982 – Present) |
| ARNOLD & PORTER | | |
| Rezneck | $175 | |
| Burt | $150 | |
| Lindon | $ 75 | |

■ The Court finds no merit in Defendant's suggestion that Plaintiffs receive only 70% of the lodestar rates for time spent negotiating and litigating the attorneys' fee. There is no evidence that attorneys typically charge their clients a reduced hourly rate when they litigate an award of attorney fees on their behalf. Moreover, there is virtually no support in the case law for such a result.[38] The Court of Appeals has awarded fees to counsel who represented plaintiffs on the fee issue at the same lodestar rates awarded to plaintiffs' counsel on the merits. *E.g., EDF v. EPA,* 672 F.2d at 64.[39] Any other result might create an incentive for defendants to over-litigate the attorney fee issue. *Cf. Copeland,* 641 F.2d at 899. Plaintiffs' counsel shall be compensated for their work on the attorneys' fee at the same rates awarded on the merits.

## IV. Increases to the Lodestar

The second major point of contention in this fee application is Plaintiffs' request for an increase in the lodestar to account for the contingent nature of success, the delay in receipt of payment, and the allegedly

**37.** There is only one respect in which Plaintiffs' requested hourly rates are inadequately supported. As noted in Part II, *supra,* Gilbert Feldman, although not associated with Bredhoff & Kaiser, participated at trial at the request of Plaintiffs' counsel. Because Feldman graduated from law school 19 years prior to the trial, Plaintiffs request an award of $150 per hour for his time. The Court has reviewed Feldman's resume, included as Exhibit 4 to Gottesman's Affidavit, and concludes that it does not reflect that level of superior achievement, expertise, skill and/or reputation that justifies the hourly rates awarded Plaintiffs' retained counsel. This Court cannot assume that these qualities are a natural function of the passage of time following law school graduation. Absent a more complete record as to Feldman's professional qualifications, the Court cannot award the same hourly rates to which Plaintiffs' retained counsel are entitled. The Court concludes that an award of $100 per hour is reasonable compensation for Feldman's services.

**38.** The only case in this Circuit that Defendant cites in support of a lower lodestar rate for the attorneys' fee issue involved an unusually simple fee application. In *Smith v. Schweiker,* No. 76–2311 (D.D.C. May 29, 1981), *aff'd mem.,* 679 F.2d 262 (D.C.Cir.1982), the Court reduced the lodestar rate for work on the fee issue where "[t]wo applications had already been filed, leaving for [the applicant] the relatively simple task of updating the petitions." Slip op. at 5.

**39.** *See also, Veterans Education Project v. Secretary of the Air Force,* 515 F.Supp. 993 (D.D.C. 1981), *aff'd,* 679 F.2d 263 (1982).

exceptional quality of the representation. Plaintiffs assert that

> [t]his is an extraordinary and exceptional case in every respect—in duration, scope, complexity, difficulty, novelty, importance, vigor and intensity of litigation, risks assumed, results obtained, quality of legal services provided to the plaintiffs, and significant public policies at stake

and that it is therefore deserving of an upward adjustment of "at least" 200.[40] Defendant, on the other hand variously describes Plaintiffs' proposed adjustment as "grossly excessive," "aberrationally large," and a product of "convoluted methodology" that is totally at odds with the case law in this Circuit. The Court concludes that, as is frequently the case, the proper path lies somewhere between the two extremes.

 The Court begins with the familiar proposition that, although the lodestar generally compensates lawyers adequately for their time, *Copeland,* 641 F.2d at 894, it may be adjusted upward (or, in an appropriate case, downward) to reflect a number of factors peculiar to the lawsuit. The Court of Appeals has identified two broad categories of adjustments that may be made: (1) "contingency" adjustments: compensation for the risk of not prevailing and thus not recovering a fee, and compensation for the delay in payment of fees [41] and (2) "quality" adjustments: compensation for unusually good representation and compensation for securing exceptional results. *Copeland,* 641 F.2d at 892–894; *Concerned Veterans,* 675 F.2d at 1328–1329. Lodestar adjustments are not "bonuses" or "rewards" in excess of an attorney's deserved compensation, but are an "attempt to calculate more precisely the market value of the services provided by the attorney." *Alabama Power Company v. Gorsuch,* 672 F.2d 1, 6 n. 28 (D.C.Cir.1982). Plaintiffs, of course, bear the burden of justifying the increases they seek by identifying clearly the particular circumstances

of the case that warrant the proposed adjustments. *Copeland,* 641 F.2d at 892; *Concerned Veterans,* 675 F.2d at 1328.

## A. Quality of Representation

 Two distinct factors may justify an increase in the lodestar to reflect the quality of representation afforded the prevailing plaintiff: An upward adjustment for quality is appropriate when the attorney (1) performed exceptionally well or (2) obtained an exceptional result. *Copeland,* 641 F.2d at 894. It is clear, however, that quality adjustments are not granted routinely or liberally, but are reserved for truly exceptional cases. *Concerned Veterans,* 675 F.2d at 1329; *Donnell v. United States,* 682 F.2d 240, 254 (D.C.Cir.1982), *cert. denied,* ―― U.S. ――, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983). An adjustment is not merited simply because counsel competently pursued the litigation to a successful conclusion, 682 F.2d at 255, or obtained an enormous dollar recovery, 641 F.2d at 894, but is appropriate only in the rare instances where an attorney's performance is not accurately reflected in the lodestar calculation. Thus,

> [a] quality adjustment is appropriate only when the representation is unusually good or bad, *taking into account the level of skill normally expected* of an attorney commanding the hourly rate used to compute the "lodestar."

*Copeland,* 641 F.2d at 893. Similarly, an adjustment for exceptional results is merited only where, taking into account the hourly rate commanded and the number of hours expended, the results are substantially better than could reasonably have been expected. *Copeland,* 641 F.2d at 894; *Donnell,* 682 F.2d at 255 n. 51. When viewed in light of these standards, Plaintiffs' request for a 100% quality adjustment does not withstand scrutiny.

 Every individual involved in or familiar with this lawsuit acknowledges that

---

**40.** Plaintiffs' Application at 6. The multipliers are requested only for attorney hours spent on merits issues; Plaintiffs do not seek a lodestar adjustment for hours devoted to the fee negotiations and litigation.

**41.** The Court addresses these two factors separately, *infra,* under the headings "The Risk Premium" and "Delay in Receipt of Payment."

Plaintiffs' counsel are first-rate lawyers. They are extremely experienced, extraordinarily capable attorneys who provided Plaintiffs with legal representation of the highest caliber. For these reasons, Plaintiffs requested and have been awarded compensation at hourly rates commensurate with the most experienced, highly respected, and capable attorneys in the District of Columbia. And for *that* reason, no additional increase to compensate for the quality of counsels' performance is warranted.

Plaintiffs' counsel clearly performed with distinction, but that is no more than the Court or Plaintiffs would demand of counsel earning up to $175 per hour. Counsels' legal acumen and impressive performance in this case are "precisely what one would expect from an attorney particularly experienced in this field serving as a party's lead counsel in a complex litigation," *Donnell*, 682 F.2d at 255, and are fully accounted for in the lodestar rates.

 The results obtained in this case also are consistent with the caliber of representation provided by counsel and the number of hours devoted to the case. This Court is reluctant to endorse Plaintiffs' claim that its counsel "conducted the litigation of this case in remarkably efficient fashion," devoting fewer attorney hours to the case than might be expected from the complexity and magnitude of the tasks. Assuming, however, that counsel did litigate this action in fewer hours than most attorneys would have required, that probably is attributable largely to counsels' deci-

sion to utilize the talents of its more knowledgeable, experienced partners for the bulk of the tasks. The Court has indicated already that this allocation of resources was not unreasonable, and it does not mean to intimate otherwise here. The Court notes only that, taking into account the generous hourly rates awarded for over 13,300 hours of counsels' time, the favorable result in this litigation was not truly exceptional.[42]

The Court's conclusion that no quality adjustment to the lodestar is appropriate is not intended to impugn the quality of counsels' legal services or to denigrate the doctrinal or practical significance of this lawsuit. The case was an important one which furthered the goals of both Title VII and the Equal Pay Act; it simply was not "exceptional" as that term has been defined by the Court of Appeals in this Circuit. *See Donnell*, 682 F.2d at 255 n. 51.

### B. The "Risk Premium"

 · Where a prevailing plaintiff's counsel litigates Title VII claims on the understanding that it will receive no significant remuneration unless the lawsuit is successful, an upward adjustment in the lodestar is appropriate "to compensate for the risk that the lawsuit would be unsuccessful and that no fee at all would be obtained." *Copeland*, 641 F.2d at 892. The "contingency adjustment" or "risk premium" is a percentage increase in the lodestar[43] and "is designed solely to compensate for the possibility *at the outset* that the litigation would

---

**42.** Plaintiffs suggest that the results were exceptional because, despite complex, uncertain legal and factual issues and a most formidable and determined opposition, they obtained "the largest backpay award in the history of Title VII and/or the Equal Pay Act." Plaintiffs' Application at 144. In short, Plaintiffs maintain that "[n]o one could conceivably have 'reasonably ... expected' that plaintiff[s] would prevail to the extent they have in this case." *Id.* at 145. The short answer to this assertion is that "the complexity and uncertainty of the issues in the case are considerations in determining whether there was a possibility that no fees would be recovered and therefore whether a *contingency* adjustment is appropriate." *Donnell*, 682 F.2d at 254 (footnote omitted) (empha-

sis added); they do not justify an adjustment for the quality of representation.

**43.** Where the hourly rates used in calculating the lodestar include an allowance for the possibility that the suit would not succeed and no fee would be obtained, no percentage adjustment for risk is appropriate. *Copeland*, 641 F.2d at 893; *Concerned Veterans*, 675 F.2d at 1328. The prevailing rates awarded in this case, however, do not incorporate a risk factor. They are the rates paid on a regular basis to lawyers whose skill and experience are comparable to those of Plaintiffs' counsel, without regard to the outcome of the litigation. Thus, the lodestar calculation here does not account for the risk of not prevailing.

be unsuccessful and that no fee would be obtained."[44] *Id.* at 893 (emphasis added). Although the inquiry is "difficult in hindsight," *id.*, the Court must assess the "actual probability" that *the fee applicant would have lost the case and recovered no fee.* *Donnell,* 682 F.2d at 254 n. 43.

There is no dispute here that counsels' receipt of fees depended upon the successful termination of the litigation and that Plaintiffs therefore are *entitled* to a risk adjustment. *See Concerned Veterans,* 675 F.2d at 1328. It remains only for the Court to ascertain the amount of the "risk premium" that should be awarded. Although this task is "inherently imprecise" and necessarily entails "certain estimations," *Copeland,* 641 F.2d at 893, it is incumbent upon Plaintiffs to "identify the specific circumstances of the case which support a risk adjustment in the amount requested." *Concerned Veterans,* 675 F.2d at 1328.

In order to assess the risk that Plaintiffs' counsel accepted at the outset of this litigation, the Court must consider not only the probability of success but what was being risked. The former category requires an evaluation of (1) the legal and factual complexity of the case;[45] (2) the probability of defendant's liability, including whether it has been suggested by previous proceedings and whether it is asserted under existing case law or is advanced as a novel theory; and (3) the difficulty or ease with which damages (if any) could be proven. *See Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.* (Lindy II), 540 F.2d 102, 117 (3d Cir.

1976). The latter category includes the number of hours and the amount of out-of-pocket expenses risked without guarantee of compensation. *Id.*

The Court's review of these factors, in light of the documentation incorporated in Plaintiffs' fee application and the Court's own intimate familiarity with the litigation, suggests that a risk adjustment of 100 percent is appropriate.

When Plaintiffs' counsel agreed to undertake this lawsuit thirteen years ago, they did so with the understanding that they would not be compensated for their labor unless they ultimately prevailed on the merits and that, in any event, they would receive no payment until the case was concluded. They had every reason to anticipate then that the case would require a substantial investment (both in time and out-of-pocket expenditures) over an extended period.[46] The case was contemplated as a class action on behalf of over 3,300 flight attendants; the alleged statutory violations touched virtually every aspect of Defendant's employment practices and raised a multitude of legal and factual issues; and the outcome of these issues was far from preordained. No prior government or private proceeding had suggested Defendant's liability or had even developed the facts of the case; Plaintiffs' counsel had to conduct their own extensive investigation and discovery, and they simply could not know at the outset of their representation how the critical facts would develop.[47] *See Lindy II,* 540 F.2d at 117.

---

44. The risk described in Copeland is not, as Defendant suggests, the risk of "severe financial dislocation" or of financial ruin. It is simply the risk that services will be provided without ever receiving compensation. Plaintiffs' counsel undertook that risk and shall be compensated accordingly.

45. *See Donnell,* 682 F.2d at 254.

46. *Cf.* Affidavit of Richard Sobol, Defendant's Exhibit 20. Mr. Sobol, a "well known Title VII litigator," indicates that employment discrimination cases "are ordinarily very prolonged. Cases lasting ten or fifteen years . . . are not uncommon." Sobol Affidavit ¶ 12, Sobol Declaration ¶ 2. *See* NWA Submission at 77–78.

47. Plaintiffs' counsel correctly anticipated "swearing contests" between Defendant's officials and members of the plaintiff class concerning a number of factual issues. According to Gottesman, however, that was only one of the factual obstacles littering counsels' path: "[A]s we had not yet had the benefit of discovery, we could not evaluate the weight that *documentary* evidence might have in corroborating the testimony of Northwest's witnesses. We knew . . . that there were documents supporting Northwest's position on the equal pay issue; for all we knew, there might be documents supporting its position on the other factual issues as well—perhaps even documents that conclusively established the correctness of

Moreover, the case was brought at an early stage in the development of the law under Title VII and the Equal Pay Act. There were few significant legal precedents interpreting either of the statutes and none from the United States Supreme Court. Thus, Plaintiffs' counsel could not know or reliably predict what the controlling standards would be.[48]

Finally, Plaintiffs knew they were facing a large, well-financed corporate defendant with a policy and history of tenaciously defending cases brought against it. This fact, combined with the unsettled state of the law, presaged a protracted battle in both the trial and appellate courts. And Plaintiffs' counsel knew at the outset that the battle would be waged on Defendant's behalf by extremely capable counsel. Thus, Plaintiffs' counsel knew from the beginning that they would be met with a maximum

legal effort both in terms of the quality of defense counsel and the vigor with which Defendant would litigate the action, and that nothing less than the same effort would be required of them.[49]

The Court is mindful that the issues of first impression in this case cannot form the basis of an adjustment to the lodestar. *Donnell,* 682 F.2d at 253–54. The Court is also cognizant of the relationship between the difficulty of the case and the lodestar.[50] But when a case involves complex and uncertain issues, that fact *does* inform the Court's decision on the entitlement to and size of a risk adjustment, and it is apparent that this litigation was fraught with such issues. Although the Court is loath to attempt to quantify the risk undertaken, it appears that Plaintiffs' likelihood of success was approximately 50%.[51] When the Court

its version of the facts." Gottesman Affidavit at 34–35.

**48.** The fact that there was no controlling Supreme Court precedent magnified the risks in several aspects. First, it made extended appeals a virtual certainty. Second, the absence of an authoritative interpretation of the law raised the possibility that intervening appellate decisions might alter the legal principles that were developing in the lower courts, or that might be developed in this very case.

**49.** Plaintiffs' expectations clearly have materialized. Defendant has vigorously and unremittingly litigated every aspect of this case. No contested issue was won easily and precious few were conceded; every conceivable argument and defense was advanced (and, in some instances, advanced more than once) by counsel of the highest caliber. Even now, in the third round of appeals, Defendant continues to litigate issues that were decided in this Court's 1974 liability ruling and affirmed by the Court of Appeals in *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). *See Brief for Northwest Airlines, Inc., Laffey v. Northwest Airlines, Inc.,* Nos. 83–1033, 83–1034, and 83–1168 (filed June 8, 1983).

**50.** "If a case was particularly difficult, it probably required a large number of hours of attorney time, a factor which will show up in the lodestar calculations. And if especially talented counsel were necessary to litigate the case, this fact will be reflected in the hourly rate used in setting the lodestar fee." *Donnell,* 682 F.2d at 253–54 (footnote omitted).

**51.** The uncertainties counsel faced in terms of credibility disputes and the governing legal standards unquestionably injected an element of risk into the case. The Court does not believe, however, that the deck was as stacked against Plaintiffs as their fee application suggests; the legal and factual issues could have been resolved in either parties' favor with approximately equal probability. For example, the Court rejects Plaintiffs' suggestion that Defendant's corporate officials are inherently more credible than their plaintiff-employees and that, therefore, the likelihood that Plaintiffs would triumph in the credibility battles was "realistically ... less than 50%." Plaintiffs' Application at 127.

It is noteworthy, however, that until the entry of this Court's remedial order in 1974, Defendant apparently did not believe that Plaintiffs stood a significant chance of prevailing. For the first three and one-half years of the lawsuit, Defendant made no report to its stockholders respecting the lawsuit, as it would have been required to do had it considered the suit to have the potential of a material effect on its finances. Indeed, despite this Court's entry of a $52 million backpay award against it, it appears that Defendant still faces this action with a good measure of optimism; in a filing with the Securities and Exchange Commission at the close of 1982, Defendant described its potential liability as follows: "The ultimate outcome of the litigation cannot be predicted and, therefore, no specific amount of ultimate liability may be estimated as probable. The Company estimates that its ultimate liability may range from approximately $1 million to approximately $52 million." *See* Plaintiffs' Application at 117–118, 135.

factors into the calculus the magnitude of the undertaking and, consequently, the number of hours counsel placed at risk, it is apparent that Plaintiffs are fully deserving of 100% contingency adjustment. *See McDonald v. Johnson and Johnson,* 546 F.Supp. 324 (D.Minn.1982). *See also* Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?,* 126 U.Pa.L.Rev. 281 at 324–26.

### C. Delay in Receipt of Payment

█ The Court of Appeals recognized in *Copeland* that the hourly rates used to calculate the lodestar "represent the prevailing rate for clients who typically pay their bills promptly," while "[c]ourt-awarded fees normally are received long after the legal services are rendered." 641 F.2d at 893. It therefore authorized an adjustment to the lodestar to recompense a successful plaintiff for the loss occasioned by the unavoidable, yet costly, delay.

Plaintiff identifies two components to the loss caused by delay in the receipt of payment:

> The first is that inflation erodes the value of the dollar so that $100 in 1983 is not the same as $100 in 1970; the second is that the use of the money during the period of delay is lost—in other words, whatever that money could have been used for during that period, or could have earned during that period above and beyond keeping up with the inflation rate, is lost.

Plaintiffs' Application at 136. Plaintiffs assert that an award of counsels' current rates for all hours devoted to this litigation would "roughly account for the inflation that has occurred in the period of delay," but maintain that it would not compensate for the loss of the use of the money. Thus,

even after correcting for inflation, it is necessary to provide an additional adjustment estimated at 2% per year to fully compensate plaintiffs' counsel for the failure to receive fees on a prompt and regular basis during the period of this case.

Plaintiffs' Application at 137.

It is clear that Plaintiffs are entitled to a substantial adjustment for delay. This action was filed in 1970 and has been litigated vigorously and almost continuously ever since.[52] Plaintiffs' counsel have yet to receive one penny of compensation for over 13,300 hours of work.[53]

The issue dividing the parties, however, is not whether *any* delay adjustment is appropriate, but whether the Court may compute the lodestar based on counsels' current hourly rates and then increase the lodestar to account further for delay. Defendant contends that Plaintiffs' "two-tiered" approach constitutes "double-counting" that is explicitly forbidden in this Circuit.

*Copeland* raised the possibility that both adjustments could be made when it suggested that

> if the "lodestar" itself is based on *present* hourly rates, rather than the lesser rates applicable to the time period in which the services were rendered, the harm resulting from delay in payment may be largely reduced or eliminated.

641 F.2d at 893, n. 23. And in *EDF v. EPA,* the Court of Appeals itself fashioned such an award.[54] Shortly thereafter, however, the Court issued the unambiguous directive that "where the hourly rate used in computing the lodestar is based on present hourly rates a delay factor has implicitly been recognized and no adjustment for delay should

**52.** And the drama still has not reached its denouement. The parties appealed the Court's judgment of November 30, 1982 and will doubtless pursue the same course with the fee award. Plaintiffs' counsel should not anticipate banking their fees in the near future.

**53.** Although many of the hours for which Plaintiffs seek compensation were logged in recent years, many were expended in the first several years of the litigation.

**54.** The Court awarded counsel their current rates for all hours devoted to the litigation and then increased the lodestar by 17% to reflect both the "benefits to the public from suit" and delay in receipt of payment. 672 F.2d at 59–60. Slightly less then three years had elapsed between the time the suit was filed and the fee award.

be allowed." *Concerned Veterans,* 675 F.2d at 1329. That pronouncement was followed two months later by an approving citation to the original *Copeland* language. *Donnell,* 682 F.2d at 254. In short, the Court of Appeals has not spoken consistently on this subject.

■ The Court concludes that where a fee applicant can demonstrate that an award of counsels' current hourly rates only partially compensates for the losses occasioned by delay, the Court can and should grant an additional adjustment to the lodestar to arrive at a fee that is fully compensatory. Although this approach appears to be at odds with *Concerned Veterans,* it is in full accord with *Copeland, EDF v. EPA,* and *Donnell* and with the underlying compensatory purpose of Title VII fee awards.[55] The record before this Court, however, does not justify such an increase.

The declaration of economist Harriet Zellner, on which Plaintiffs rely, does not substantiate Plaintiffs' claim that an award of current hourly rates significantly underestimates the actual losses caused by delayed payment; it appears that Zellner simply *assumed* that current rates correct for inflation and, on that premise, proceeded to her conclusion that an additional 14% lodestar adjustment is necessary. Her "expert" opinion, therefore, does not provide the specific documentation for lodestar increases that *Copeland* and its progeny require.[56]

■ The Court has awarded Plaintiffs the hourly rates prevailing in 1983 for all hours their counsel have invested in this litigation since 1970. The Court finds that this adjustment approximates and fairly compensates Plaintiffs for the losses caused by a delay in payment of over 13 years. Nothing in the record demonstrates otherwise.[57]

## V. Litigation Expenses

Plaintiffs request an award of $256,650.14 for "reasonable litigation expenses" incurred during the course of this action. Under this rubric, Plaintiffs seek compensation for 4,319 hours of paralegal and law clerk time, counsels' direct out-of-pocket expenditures, and a variety of expenses incurred by the named plaintiff, Mary Pat Laffey. Defendant challenges all but $127,959.23 of this amount on the grounds that the claims fall outside the category of compensable litigation expenses, are "demonstrably unreasonable," or are insufficiently documented. The following table summarizes the parties' positions:

**55.** The goals of Title VII are not realized by a miserly approach to the fee award, but through awards that represent the full value of the legal services rendered. Indeed, awarding counsel less than a "full fee award" could have deleterious consequences. *Cf. Copeland,* 641 F.2d at 899.

**56.** The affidavit from Stephen Brenner, Defendant's economist, is also of limited value. Although Brenner concludes that counsels' current hourly rates account for *both* inflation and the use of money, the calculations on which he bases his opinion are based upon counsels' historic rates, rather than the market rates awarded by the Court.

**57.** The Court rejects Defendant's suggestion that a portion of the delay was attributable to Plaintiffs' dilatory tactics and should be disregarded. Defendant may have been prepared to initiate the fee litigation in February 1978, but this Court deemed Defendant's timing inappropriate. Defendant cannot seriously expect this Court to penalize Plaintiffs for postponing their fee application when that course of action was explicitly approved by the Court. In any event, beginning the fee negotiations in February 1978 would not have eliminated the last 4½ years of delay, for the parties were still actively litigating the remand issues until November 30, 1982.

The Court also discards Defendant's suggestion that the delay adjustment should be reduced because the delay in this case was not unique. This argument simply is beside the point. The purpose of a delay adjustment is to compensate for losses that are caused by anything more than minimal delay in the receipt of payment. *Concerned Veterans,* 675 F.2d at 1328. Counsels' ability to foresee the delay in no way lessens the losses caused by the passage of time and it has no bearing on either entitlement to, or the amount of, a delay adjustment.

| BREDHOFF & KAISER | Amount Requested | NWA's Proposal |
|---|---|---|
| **Merits Issues** | | |
| Paralegals/Clerks | $ 76,290.15 | $ 76,065.00 |
| Disbursements | 101,183.84 | 29,390.04 |
| Sub-Total: | $ 177,473.99 | $ 105,455.04 |
| **Attorneys' Fee Issues** | | |
| Paralegals/Clerks | $ 27,529.50 | $ 9,244.50 |
| Disbursements | 4,960.32 | 608.81 |
| Sub-Total: | $ 32,489.82 | $ 9,853.31 |
| **ARNOLD & PORTER** | | |
| Paralegals/Clerks | $ 25,770.00 | $ 10,061.25 |
| Disbursements | 20,916.33 | 2,589.63 |
| Sub-Total: | $ 46,686.33 | $ 12,650.88 |
| TOTAL: | $ 256,650.14 | $ 127,959.23 |

## A. Disbursements

The focal point of Defendant's challenge to Plaintiffs' disbursements is its contention that recoverable litigation expenses under the Title VII fee-shifting statute are limited to items that are taxable costs under 28 U.S.C. § 1920. According to Defendant, the bulk of Plaintiffs' out-of-pocket expenses fall outside the scope of such costs and therefore are not compensable.[58]

A number of courts have held that where attorneys' fees are authorized expressly by statute, recoverable litigation expenses are not limited to taxable costs. *See, e.g., Dowdell v. City of Apopka,* 698 F.2d 1181, 1188–89 (11th Cir.1983); *Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087, 1100 (5th Cir.1982); *Wheeler v. Durham City Board of Education,* 585 F.2d 618, 623 (4th Cir. 1978). These courts reason that awarding a prevailing party its attorneys' fees but denying compensation for expenses incident to the litigation would be "anomalous." *Copper Liquor,* 684 F.2d at 1100.

[A]ttorneys' fees and expenses are inseparably intertwined as equally vital components of the costs of litigation. The factually complex and protracted nature of civil rights litigation frequently makes it necessary to make sizeable out-of-pocket expenditures which may be as essential to success as the intellectual skills of the attorneys.

*Dowdell,* 698 F.2d at 1190. Moreover, refusal to compensate plaintiffs for their out-of-pocket costs and expenses would not effectuate the policies underlying the Title VII fee shifting statute: to encourage individuals to seek vindication of their rights, to ensure individuals who prevail in such litigation that they will be fully compensated for their efforts, and to inspire competent counsel to accept representation in such cases.[59] *Wheeler v. Durham,* 585 F.2d at 623–624; *Dowdell,* 698 F.2d at 1190.[60]

██ Although the Court of Appeals for this Circuit has not addressed the issue directly, in *Alabama Power Company v. Gorsuch,* 672 F.2d 1, 5 (D.C.Cir.1982), it approved reimbursement for some of the same types of expenses Plaintiffs claim here: postage, reproduction, travel and meals.[61] This Court concludes that the objectives of Title VII attorney fee awards and the precedent in this Circuit support a fully compensatory award, which necessarily includes all expenses incident to the litigation that are normally billed to fee-paying clients, are reasonably incurred in the liti-

---

**58.** Defendant contends that expenditures for telephone, messenger services, non-attorney overtime, word processing, local transportation, postage, and travel are non-compensable; costs associated with reproduction, printing & transcripts, expert witnesses, and "miscellaneous" items are only partially compensable under Defendant's scheme.

**59.** *See Dowdell,* 698 F.2d at 1190: "[I]f the real income of civil rights litigators is decreased because they must absorb costs which are generally billable in other types of cases, the market result will be to channel attorneys toward more remunerative types of litigation. Decreasing the supply of attorneys necessarily decreases the access to the courts of victims of civil rights violations." The Court concluded

that refusing compensation for all reasonable expenses would "penalize attorneys for undertaking civil rights litigation." *Id.* at 1191.

**60.** Although Wheeler and Dowdell involved fee awards pursuant to 42 U.S.C. § 1988, the rationale for the courts' rulings on plaintiffs' litigation expenses is equally applicable to attorney fee litigation under Title VII; the wording of the statutes is virtually identical.

**61.** Other courts in this District also have awarded reimbursement for such expenses. *See e.g., Parker v. Califano,* 443 F.Supp. 789, 797 (D.D.C.1978) ("reasonable out-of-pocket expenses," including photocopying, transportation, postage and telephone costs).

gation, and are sufficiently documented. Because Plaintiffs' affidavits establish that the expenses for which they seek reimbursement are customarily billed to fee-paying clients,[62] the Court's attention shifts to the latter two factors.

Defendant contends that Plaintiffs' out-of-pocket expenses are so sparsely documented as to render them non-compensable. It asserts that the lack of descriptive or explanatory detail with regard to many of the expenses makes it impossible for it (and the Court) to discern what the expenditures were for and whether they were reasonably incurred.[63]

■ Defendant evidently misperceives the documentation required of fee applicants. It is not necessary for plaintiffs to explain the purpose of every photocopy that is produced and every expenditure that is made in connection with the litigation. For most out-of-pocket costs, it is enough for plaintiffs to identify the expenses by category, with a general description of the types of charges included in each category. In the case of particularly large or unusual expenditures, some additional explanation of the purpose of the expense may be necessary, but this is not the norm. *Copeland* specifically admonished trial courts to avoid "becom[ing] enmeshed in a meticulous analysis of every detailed facet of the professional representation." 641 F.2d at 896 (quoting *Lindy II,* 540 F.2d at 116). This admonition applies equally to the Court's assessment of the lodestar components and to its inquiry into the reasonable costs of the litigation.

The Court has reviewed Plaintiffs' tabular and descriptive summaries of their expenses and concludes that, in most instances, the documentation provided is sufficient. Plaintiffs have compiled a daily break-down of all expenditures made by Bredhoff & Kaiser from July 31, 1971 to the present;[64] each expense is allocated to one of ten categories of expenditure.[65] The expenditures made by Arnold & Porter in connection with the fee litigation are summarized by category. Affidavits from Messrs. Gottesman and Rezneck expound upon the types of expenditures—and in some instances, the specific charges—included in the various categories for which reimbursement is sought. With the few exceptions noted below, more detailed information is neither necessary nor useful. Indeed, the amount of time that would be required to document each item of expense in the detail apparently suggested by Defendant would be prohibitive; the compensable time required to generate the detail would exceed the expenses claimed. Neither *Copeland* nor *Concerned Veterans* contemplated such an absurd result and this Court will not require it.[66]

Having said this, however, several items of expense deserve mention, either because

---

**62.** *Cf. American Jewish Congress v. Kreps,* No. 75–1541, slip op. at 10 (D.D.C. Oct. 16, 1981): "Private firms routinely bill their clients for telephone charges, duplicating costs and the like."

**63.** Much of Defendant's dissatisfaction with Plaintiffs' documentation stems from its contention that only taxable costs under 28 U.S.C. § 1920 are compensable; since Plaintiffs' records do not itemize these "taxable costs" separately from the remainder of its costs, Defendant contends that the entire amount claimed for expenses must be disallowed. This Court does not accept Defendant's taxable cost argument and, to that extent at least, Defendant's complaints about the adequacy of the documentation are ill-founded.

**64.** Expenditures prior to July 31, 1971, totalling $986.64, are listed as "miscellaneous" expenses for which "no back-up or breakdown" is availa-

ble. As noted later in this section, these hours are compensable nonetheless.

**65.** The categories include telephone, messenger services, word processing, support staff overtime and secretary fees, reproduction, postage, attorney and attendant travel, printing and transcripts, expert and local counsel, and miscellaneous.

**66.** It is somewhat ironic to find Defendant clamoring for *more* supporting information. After complaining that Plaintiffs have beseiged the Court with superfluous documentation and transformed a seemingly "straightforward" fee application into a full-blown (indeed, overblown) litigation, Defendant urges the Court to demand a level of documentation that would tend toward the same result.

they belong to one of the few categories for which documentation truly is lacking or because they were not reasonably incurred.

■ First, Plaintiffs seek compensation for $986.64 in "miscellaneous" charges incurred prior to July 31, 1971. Gottesman concedes that the "bookkeeping records for that period are terse and back-up materials are missing," but has attempted to reconstruct the expenditures. He notes that the first year of litigation involved a filing fee and duplication costs for all initial pleadings; numerous long-distance telephone conversations with cabin attendants who wished to become plaintiffs and with Defendant's Minneapolis counsel; and, most important, preparation and mailing of two class notices (with postage-paid return envelopes) to over 1,500 cabin attendants.

Although counsel cannot provide more specific documentation for these items of expenditure, it is apparent that these tasks *were* performed and that they involved substantial outlays of funds by Plaintiffs' counsel. In this instance, the Court is "content to rely upon the integrity of counsel, and allow these expenses." *See Alabama Power Company v. Gorsuch*, 672 F.2d at 5 (footnote omitted).

Of the remaining $682.77 in "miscellaneous" expenses, some of the entries have no identifying notations and others note only that the money went to "supplies." Since the cost of attorneys' supplies typically is subsumed in the hourly rates, some additional explanation of these purchases is necessary to render them compensable.[67] Similarly, without some indication of the nature of the other miscellaneous expenses, they must also be disallowed.

■ Second, Plaintiffs request an award of $807.04 for printing costs and filing fees incurred in the *Laffey I* appeal. The Court of Appeals expressly denied reimbursement for these expenditures on the ground that Plaintiffs' bill of costs was filed untimely. *Laffey v. Northwest Airlines, Inc.*, 587 F.2d 1223 (D.C.Cir.1978). This Court cannot and will not disregard that ruling.

Third, Plaintiffs' counsel includes in their expenses duplication fees, transportation costs, and messenger charges incurred while compiling affidavits in support of the fee application. As noted in Part II–D(1), *supra*, these affidavits were not all reasonably necessary to the prosecution of the fee application, and a portion of the attorney time devoted to their collection was excluded from Plaintiffs' proposed lodestar total. It follows that out-of-pocket expenditures claimed in connection with the affidavits should be similarly reduced; the Court estimates that $600 in transportation costs, $2,500 in duplication charges, and $200 worth of messenger services are attributable to these tasks and therefore shall be disallowed.[68]

■ Fourth, Arnold & Porter seeks reimbursement of $4,739.00 for the services of several consultants. Rezneck's supplemental affidavit indicates that $2,790.00 of this sum was paid to Mr. Beverly Moore, editor and publisher of *Class Action Reports*, who was consulted concerning lodestar awards and adjustments in cases similar to *Laffey*. The consultation culminated in an affidavit that was appended as an exhibit to Plaintiffs' Reply Brief. The Court has reviewed Moore's affidavit and concludes that his services were not reasonably necessary to the conduct of the fee litigation. Neither the Court nor counsel needs an "expert" to

---

67. The Court encounters the same difficulty with the request for $3,041.72 of "word processing" costs. The Court is under the impression that support services of this sort are part of the overhead costs that are generally included in an attorney's hourly rate. Therefore, without some additional explanation of the costs (including some indication that attorneys routinely bill clients for these services separately) they must be excluded from Plaintiffs' reimbursable costs.

68. Plaintiffs note further that a portion of Arnold & Porter's transportation expenses were generated by trips "to and from Bredhoff & Kaiser to deliver documents and drafts of court papers and for periodic consultations." For the reasons set forth in Part II–D(2), *supra*, this portion of the transportation expenditures is not compensable. An additional $200 shall be subtracted from Plaintiffs' compensable expenses.

review and compare the lodestar adjustments awarded in other cases. In any event, such adjustments are uniquely geared to the facts of each case and an extensive study such as Moore conducted is simply of little value to the Court. Defendant should not be saddled with this expenditure.

▇▇ Another $500 in consulting fees was paid to Frederick Amling, a professor of business finance at George Washington University, who was consulted on the "economics of risk analysis." The Court is not persuaded that this consultation was reasonably necessary for the thorough presentation of Plaintiffs' fee request, and the monies paid to Dr. Amling therefore will not be reimbursed.

▇▇ Fifth, Plaintiffs' expense roster includes $6,344.95 for support staff overtime (including associated meals and transportation) for which they are not entitled to reimbursement. The Court does not suggest that overtime charges are never an appropriate component of a court-awarded fee. Such expenses, however, are in the nature of an exceptional expenditure and require some justification before they can be assessed against the losing party. *See Wheeler v. Durham Board of Education,* 585 F.2d at 623, n. 7.

▇▇ Sixth, Arnold & Porter seeks compensation for $4,822.25 in charges for LEXIS computer assisted research. A portion of this sum doubtless is attributable to the eighteen page print-out of every case that has ever cited the *Laffey* decision (an attempt on Plaintiffs' part to persuade the Court of the importance of the lawsuit). *See* Exhibit C, Appendix III to Plaintiffs' Application. The remainder of the charges is apparently for various research projects performed by Arnold & Porter on the fee issue—this in addition to the hours of traditional, manual research for which compensation is sought. Plaintiffs' assertion that all of this research was reasonable and necessary simply strains credulity; they shall receive compensation for only $2,000 in LEXIS charges.

▇▇ Finally, an unspecified portion of Plaintiffs' reproduction expenses are attributable to copies of legal research material made by counsel for their own use. It appears that such copies are principally a matter of convenience for the attorneys—rather than necessity—and the Court is not persuaded that Defendant should foot the bill for these expenditures. The Court accepts Gottesman's estimate that approximately 20% of his firm's reproduction costs are attributable to this type of activity[69] and reduces Plaintiffs' reimbursable expenses accordingly. The Court estimates that 10% of Arnold & Porter's duplication charges are attributable to copies of this sort and adjusts the awardable expenses accordingly.[70]

The total amount of compensable disbursements is $93,822.12.

B. Ms. Laffey's Expenses

▇▇ Plaintiffs seek $7,861.38 on behalf of the named Plaintiff, Mary Pat Laffey, for expenses she incurred as a result of this litigation. Approximately one-third of this sum is for actual out-of-pocket expenditures necessitated by Laffey's active participation in the case.[71] The remainder represents wages that Ms. Laffey allegedly would have received had she not been obliged to take days off from her job to attend depositions, settlement conferences and trial and to assist otherwise in the litigation.

Defendant objects strenuously to the requested amounts. It contends that the lost wage claim is not a recoverable cost, that it is an untimely request for backpay, and that, in any event, the request is inadequately documented, since the application

---

**69.** *See* Second Gottesman Affidavit at 42.

**70.** A total of $4,888.26 in duplicating costs—$3,973.60 of Bredhoff & Kaiser's charges and $914.66 of Arnold & Porter's—are deducted from Plaintiffs' compensable expenses.

**71.** These items include telephone, postage, and travel expenses totaling $2,292.01.

contains no explanation of how the lost-salary figure was calculated. Defendant apparently relies upon its "taxable costs" argument to defeat Plaintiffs' claim for Laffey's out-of-pocket expenses. Neither argument is persuasive.

As noted in Part V–A, *supra,* the Court rejects Defendant's assertion that Title VII authorizes only an award of taxable costs delineated at 28 U.S.C. § 1920. Gottesman's Second Affidavit explains the purpose of Ms. Laffey's telephone, postage and travel expenses to this Court's satisfaction. Because she was a named plaintiff in this suit, it was inevitable that Ms. Laffey would participate in the development and trial of the case; indeed, it was incumbent upon her to do so. This Court is unwilling to penalize her for accepting that role and actively assisting counsel in the case. Plaintiffs are entitled to an award of $2,292.01 for Ms. Laffey's out-of-pocket expenditures.

The remainder of Laffey's expense request is attributable to her lost salary claim. Plaintiffs' counsel explains this item as follows:

> NWA correctly notes ... that cabin attendants often can arrange or trade schedules to avoid a salary loss when unavailable for flying on particular days. Laffey in fact attempted to do so on every occasion, and in consequence the major part of her participation in this lawsuit was accomplished without any loss of salary. The claim for lost salary relates to those few instances in which it was *not* possible for Laffey to avoid a salary loss through these devices. In

each of the latter instances, Laffey's absence was specifically approved by NWA, and was recorded on her records as a leave of absence.

Second Gottesman Affidavit at 45–46. The affidavit goes on to explain the method by which the salary loss was computed and notes that "Laffey checked all of the computations with supervisory personnel in NWA's Seattle office to assure their accuracy." *Id.* at 46. Although Gottesman does not set out the actual computations in his affidavit, the tabulation of Ms. Laffey's expenses itemizes the amounts of lost salary for each month in which a loss is claimed. The Court finds this documentation adequate.[72]

The only substantial question before the Court, therefore, is whether Ms. Laffey's lost salary is a compensable item of expense.[73] Despite Defendant's vociferous argument to the contrary, this Court believes that it is a legitimate expense for which Plaintiffs are entitled to compensation. *See Sebastian v. Texas Department of Corrections,* 541 F.Supp. 970, 978–79 (S.D.Tex. 1982); *Davis v. Bolger,* 496 F.Supp. 559, 563–58 (D.D.C.1980).

## C. Law Clerk and Paralegal Hours

### 1. Merits Hours

Of the 2,543 hours worked by law clerks and paralegals on the merits, Defendant challenges only 7.5 hours devoted to Plaintiffs' motion to apply the District of Columbia statutory rate of post-judgment interest.[74] The Court already determined that

---

**72.** Defendant has before it the information necessary to assess the accuracy of Plaintiffs' calculations, including the months in which Ms. Laffey took leaves of absence, the amounts she claims to have lost in each month, and its own payroll records. The Court finds it significant that Defendant has made no effort to challenge the calculations as inaccurate.

**73.** Defendant correctly notes that characterizing the lost salary claim as a disguised request for additional backpay "really does not fit." NWA Submission at 110. Plaintiffs' effort to secure compensation for the wages Ms. Laffey lost while pursuing this action is clearly distinct from the award of backpay for the Title

VII and Equal Pay Act violations that were the subject of this lawsuit.

**74.** Defendant does not object to the proposed rate of $30 per hour for paralegal and law clerk time. Based upon the documentation submitted by Plaintiffs in conjunction with the application, the Court concludes that this figure is a fair and reasonable compensation for these individuals' time. It is the rate charged to most of Bredhoff & Kaiser's clients and it is consistent with recent awards in the District of Columbia. *See, e.g., Vaughn v. Government Printing Office,* C.A. 77–787 (D.D.C. July 19, 1982).

the attorney hours devoted to this so-called "lost issue" are fully compensable; the same ruling applies to the law clerk hours spent on the same issue.

### 2. Attorneys' Fee Hours

Plaintiffs claim compensation for 1,776.65 hours worked by paralegals and law clerks on the attorneys' fee issues; 917.65 of the hours are attributable to Bredhoff & Kaiser's personnel, 859 hours to Arnold & Porter's. Defendant objects to 1,133.125 of these hours on three grounds; only one of its contentions has merit.

Defendant complains that 168 hours were devoted to "unnecessary" attorney fee discovery. This Court ruled in Part II–D(3), *supra,* that reasonable attorney hours devoted to fee discovery—both offensive and defensive—are compensable; the same is true of paralegal and law clerk hours. There is no suggestion or indication that the number of hours committed to these tasks is unreasonable, and therefore they are compensable.

Defendant next argues that there is insufficient documentation for 275.5 hours of Bredhoff & Kaiser's law clerk and paralegal time. A review of Plaintiffs' application, however, reveals no such deficiency. The Second Gottesman Affidavit identifies the individuals whose time records are in question and describes the specific projects to which they committed the disputed hours; a separate exhibit summarizes the individuals' daily time logs. Nothing more is necessary. Indeed, the Court is at a loss to understand what additional information *could* be furnished.

Defendant's final argument challenges the reasonableness of the total number of law clerk and paralegal hours devoted to the fee award. Specifically, Defendant alleges that much of the time spent by law clerks and paralegals at the two firms was duplicative and that one-half of the hours spent on research and data compilation should be eliminated. The Court has reviewed Plaintiffs' time records and concurs that a number of hours either were excessive or unreasonably spent. For example:

—Twenty-two hours of law clerk and paralegal time devoted to inter-firm conferences must be subtracted from Plaintiffs' compensable hours. See Part II–D(1).

—In April 1983, Arnold & Porter brought a new law clerk, Mr. Gordon, into the case. He spent approximately 10.25 hours familiarizing himself with the case and reviewing the fee application. It is unreasonable to bill Defendant for this kind of "start-up" cost so close to the conclusion of the fee litigation.

—An Arnold & Porter paralegal spent the better part of 67 hours reviewing and compiling Arnold & Porter's expenses. Given the "computerized accounting records" maintained by the law firm, *see* Supplemental Rezneck Affidavit, the Court is astonished at the number of hours devoted to this task. Only 37 hours will be included in Plaintiffs' compensable expenses.

—One Bredhoff & Kaiser law clerk spent approximately 200 hours conducting "comprehensive research" of attorney fee cases, including approximately 12 hours of "background" research. This project was completed prior to Arnold & Porter's involvement in the fee dispute, and although a copy of the resulting legal memorandum was provided to the firm, it does not appear to have appreciably reduced its research time. The Court concludes that this research was not essential to the preparation of the fee application and therefore is not properly compensable.

—Almost 900 additional hours were spent on research and data compilation. This sum does not include the hours of research conducted by attorneys or nearly $5,000 worth of computer-assisted research charges for which Plaintiffs also seek compensation. Given the clarity of the law governing attorney fee awards in this Circuit and the likelihood that the litigation expenses incurred in the action were tabulated as the case proceeded—if only for the in-

ternal accounting purposes of the firms—this expenditure of time is excessive. 250 hours shall be eliminated from the compensable total.

The final number of paralegal and law clerk hours for which this Court will award compensation are set forth in the final calculations in Part V, *infra*.

## V. Final Calculations

### MERITS LODESTAR

| Attorney | Hourly Rate | Merits Hours | Merits Fees | Total Merits Fees |
|---|---|---|---|---|
| Bredhoff | 175 | -- | – 0– | – 0 – |
| Feldman | 100 | 160.5 | 16,050.00 | 16,050.00 |
| Cohen | 150 | 21.5 | 3,225.00 | 6,900.00 |
| | 175 | 21.0 | 3,675.00 | |
| Gottesman | 150 | 3,248.375 | 487,256.25 | 876,294.36 |
| | 175 | 2,223.075 | 389,038.12 | |
| Weinberg | 100 | 37.375 | 3,737.50 | 161,937.50 |
| | 125 | 145.25 | 18,156.25 | |
| | 150 | 933.625 | 140,943.75 | |
| Petramalo | 100 | 32 | 3,200.00 | 46,121.88 |
| | 125 | 331.375 | 41,421.88 | |
| | 150 | 10 | 1,500.00 | |
| D. Clark | 75 | 1,817.75 | 136,331.25 | 199,981.25 |
| | 100 | 636.50 | 63,650.00 | |
| P. Clark | 100 | 606.625 | 60,662.50 | 72,115.62 |
| | 125 | 91.625 | 11,453.12 | |
| Collins | 75 | 36.25 | 2,718.75 | 80,793.75 |
| | 100 | 780.75 | 78,075.00 | |
| Gilson | 100 | 53 | 5,300.00 | 5,300.00 |
| Brudney | 75 | 75.625 | 5,671.88 | 5,746.88 |
| | 100 | .75 | 75.00 | |
| | | | TOTAL: | $1,471,241.25 |

### ATTORNEY FEE LODESTAR

| Attorney | Hourly Rate | Atty. Fee Hours | Total |
|---|---|---|---|
| Bredhoff | $ 175 | 10.75 | $ 1,881.25 |
| Cohen | 175 | 12.0 | 2,100.00 |
| Gottesman | 175 | 596.25 | 104,343.75 |
| Weinberg | 150 | 357.875 | 53,681.25 |
| Petramalo | 150 | 2.0 | 300.00 |
| P. Clark | 125 | 12.125 | 1,515.62 |
| Collins | 100 | 10.5 | 1,050.00 |
| Gilson | 100 | 2.625 | 262.50 |
| Brudney | 75 | 52.375 | 3,928.12 |
| | 100 | 10.75 | 1,075.00 |
| Reznek | 175 | 371.875 | 65,078.12 |
| Burt | 150 | 116.0 | 17.400.00 |
| Lindon | 75 | 556.125 | 41,709.38 |
| | | TOTAL: | $ 294,324.99 |

### Compensable Costs & Expenses

| | | |
|---|---|---|
| Disbursements: | | |
| Merits Issues | | $ 88,804.93 |
| Attorney Fee Issues | | 5,017.19 |
| | Sub-Total | $ 93,822.12 |
| Paralegals & Law | | |
| Bredhoff & Kaiser | | |
| Merits Issues | 2578.55 hrs. x $30/hr. = | $ 77,356.50 |
| Atty. Fee Issues | 605.65 hrs. x $30/hr. = | 18,169.50 |
| Arnold & Porter | 658.75 hrs. x $30/hr. = | $ 19,762.50 |
| | Sub-Total | $115,288.50 |
| Ms. Laffey's Expenses: | | $ 7,861.38 |
| | TOTAL: | $216,972.00 |

### Total Award of Attorneys' Fees & Costs

| | |
|---|---|
| Merits Lodestar: | $1,471,241.25 |
| 100% Multiplier | 1,471,241.25 |
| Attorney Fee Lodestar: | 294,324.99 |
| Costs & Expenses | 216,972.00 |
| TOTAL: | $3,453,779.49 |

## VI. Conclusion

This Court is dismayed at the course this fee litigation has taken. On the one hand is Defendant, who complains that Plaintiffs unnecessarily complicated a "straightforward" application, but then proceeds to advance arguments that, if accepted by this Court, would produce the same result. Defendant has approached this fee petition with an intensity and vigor even greater than that which characterized its litigation strategy on the merits of this action. The Court assumes that Defendant's counsel bills its client (and receives payment) for the massive outlays of time it makes on its behalf; yet Defendant is determined that Plaintiffs' counsel be precluded from doing the same. Quite simply, Defendant has attempted to invoke a double standard for the entirety of this fee litigation—one standard for Defendant's attorneys and quite another for Plaintiffs' counsel.

On the other hand is Plaintiffs' counsel, who plead their inability to objectively appraise their own fee request and their desire to avoid the embarrassment attendant to "tooting their own horns" to decline to

prepare their own fee application—after having already devoted hundreds of hours to the task. The result is another layer of attorneys, who, in their fervor to produce a thorough fee application have buried this Court with an avalanche of documentation—all in the name of *Concerned Veterans* and meticulous lawyering. To be sure, future fee applicants in this District may reap the benefits of Plaintiffs' over-zealous approach, but it will not be at Defendant's expense.

The Court is caught in the midst of this morass, vainly attempting to negotiate the path chartered by the Court of Appeals: to avoid allowing fee applications to assume "massive proportions" and dwarf the underlying litigation on the merits; to avoid becoming ensnared in the minute details of the professional relationship under scrutiny; and yet to insist upon specific documentation for every component of the fee award; to explain fully the premises of its "discretionary" judgments; and to state specifically why the fee opponent's claims lack merit.

The parties to this action are not the only ones who devoted inordinate amounts of time to the fee litigation. The judicial system has been "billed" an extraordinary sum for the services of the judicial personnel necessary to sift through the parties' copious submissions and to review and decide this issue. Given the Court of Appeals' insistence upon detailed documentation and explanation—ironically, in connection with judgments that are conceded to be uniquely within the capacity of the trial court and that are theoretically committed to its discretion[75]—it appears that this protracted fee litigation was inevitable.

An appropriate Order accompanies this Memorandum Opinion.

### ORDER

Upon consideration of Plaintiffs' Application for an Award of Attorneys' Fees and Expenses, Defendant's Submission with Respect to the Application for an Award of Fees and Expenses, and all subsequent submissions by the parties in connection with the fee application; the Memorandum Opinion issued this date; and the entire record herein;

It is by the Court this 29th day of July, 1983

ORDERED, that Defendant pay to Plaintiffs the sum of Three Million Four Hundred Sixty-Nine Thousand Eight Hundred Twenty-Nine Dollars and Forty-Nine Cents ($3,469,829.49) in reasonable attorneys' fees and expenses incurred in this action. Payment shall be made within fifteen (15) days of the date of this Order.

---

75. *See Hensley v. Eckerhart,* —— U.S. at ——, 103 S.Ct. at 1941.