# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 19, 2019          Decided May 21, 2019

No. 18-7004

DL, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-01437)

*Carolyn Smith Pravlik* argued the cause for appellants. With her on the briefs were *Todd A. Gluckman* and *Cyrus Mehri*. *Margaret A. Kohn* entered an appearance.

*Michael T. Kirkpatrick* and *Allison M. Zieve* were on the brief for *amici curiae* Public Citizen, Inc., et al., in support of appellants.

*Lucy E. Pittman*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Karl A. Racine*, Attorney General, and *Loren L. AliKhan*, Solicitor General. *Caroline S. Van Zile*, Deputy Solicitor General, entered an appearance.

*Charles W. Scarborough*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* United States of America supporting appellees. With him on the brief was *Jessie K. Liu*, U.S. Attorney.

Before: GARLAND, *Chief Judge*, TATEL, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Senior Circuit Judge* SENTELLE.

TATEL, *Circuit Judge*: When plaintiffs prevail in a civil rights case, the law usually entitles them to recover reasonable attorney's fees. Federal district judges, whom Congress has tasked with tabulating those fees, frequently find themselves whipsawed between two seemingly discordant instructions: (1) ascertain the hourly rate for lawyers performing similar work "with a fair degree of accuracy" using "specific evidence," *National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1325 (D.C. Cir. 1982), but (2) do so without turning fee calculations into "a second major litigation," *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). To reconcile those directives, district courts often turn to a fee matrix—that is, a chart averaging rates for attorneys at different experience levels. For decades, courts in this circuit have relied on some version of what is known as the *Laffey* matrix. Created in the 1980s, that matrix is based on a relatively small sample of rates charged by sophisticated federal-court practitioners in the District of Columbia. Litigants have updated the matrix for inflation using an assortment of tools. Recently, however, the United States Attorney's Office sought to replace this standby with a new default matrix based on data

for all types of lawyers—not just those who litigate complex federal cases—from the entire metropolitan area—not just the District of Columbia.

In this case, after plaintiffs prevailed in a long-running Individuals with Disabilities Education Act class action, the district court accepted the District of Columbia's invitation to rely on the USAO's new matrix in awarding fees. But as we explain below, the new matrix departs from the statutory requirement that reasonable fees be tethered to "rates prevailing in the community" for the "kind and quality of services furnished." 20 U.S.C. § 1415(i)(3)(C). We therefore vacate the award and remand for the district court to recalculate the hourly rate based on evidence that focuses on fees for attorneys practicing complex federal litigation in the District of Columbia.

## I.

We begin by reviewing the elementary principles governing fee-shifting rate calculations and the genealogy of fee matrices in this circuit, and then turn to the history of this particular case.

## A.

As Congress enacted a growing number of laws securing civil rights, it confronted a problem: "enforcement would prove difficult" without private lawsuits, and would-be plaintiffs needed skilled lawyers to guide them through the obstacle course of complex litigation. *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 401 (1968). But those plaintiffs often lacked financial resources "indispensable" to attracting "competent counsel" willing and able to take on defendants of greater means. *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1521 (D.C. Cir. 1988) (en banc) (internal quotation marks and emphasis omitted). So Congress

turned to fee-shifting provisions, simultaneously "encourag[ing] plaintiffs to bring suit" and allowing those who prevail to finance the cost of legal assistance by recovering fees from the defendant. Mary Frances Derfner & Arthur D. Wolf, 1 Court Awarded Attorney Fees ¶ 5.03, § 7(a) (2018 ed.); *accord Piggie Park*, 390 U.S. at 402 ("Congress therefore enacted the provision for counsel fees . . . to encourage individuals injured . . . to seek judicial relief . . . ."). "[O]ver 100 separate statutes" now provide "for the award of attorney's fees." *In re Donovan*, 877 F.2d 982, 991 (D.C. Cir. 1989) (internal quotation marks omitted); *see also* Congressional Research Service, Report 94-970, *Awards of Attorneys' Fees by Federal Courts and Federal Agencies* 57–117 (Oct. 22, 2009) (listing them).

The basic formula for calculating an attorney fee award seems straightforward: multiply "the number of hours reasonably exp[e]nded in litigation" by "a reasonable hourly rate or 'lodestar.'" *Cumberland Mountains*, 857 F.2d at 1517. The Supreme Court has offered guidance about how to perform that calculation, explaining that "reasonable fees" are those grounded in rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). The statute at issue here, the Individuals with Disabilities Education Act (IDEA), codifies that interpretation of "reasonable": "Fees awarded under [IDEA] shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415(i)(3)(C).

Implementing this relatively simple definition has proven vexing. *See Reed v. District of Columbia*, 843 F.3d 517, 521 (D.C. Cir. 2016) ("[D]etermining . . . the prevailing market rate[] is 'inherently difficult.'" (quoting *Eley v. District of*

*Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015))). We have operationalized it with a burden-shifting framework: To begin, "a fee applicant bears the burden of establishing entitlement to an award . . . and justifying the reasonableness of the rates." *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995). At that point, the claimed fee "is presumed to be the reasonable fee contemplated by" the statute, and the burden shifts to the defendant to present "equally specific countervailing evidence" if it seeks a different (presumably lower) rate. *Id.* at 1109 (internal quotation marks omitted).

For either party, a matrix showing the average hourly price tag of comparable lawyers may "provide a useful starting point" in calculating market rates. *Id.* But because such "matrices are somewhat crude," the matrix's proponent usually cannot stop there. *Id.* Instead, the proponent may point to additional evidence, which can include "surveys to update the matrix; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases." *Id.* No particular type of evidence can be considered gospel; "evidence of the prevailing market rate can take many forms." *Eley*, 793 F.3d at 104 n.5.

The first and most influential matrix in this circuit debuted in *Laffey v. Northwest Airlines, Inc.*, a 1983 Title VII and Equal Pay Act case. 572 F. Supp. 354 (D.D.C. 1983), *affirmed in part, reversed in part*, 746 F.2d 4 (D.C. Cir. 1984), *overruled in part*, *Cumberland Mountains*, 857 F.2d 1516. In those fledgling days—before big data, Google, or a prolific cottage industry dedicated to studying the legal profession—the prevailing plaintiff's attorney created a fee schedule by "inquir[ing] into the billing rates of firms in Washington, D.C., which [were] engaged in active litigation practice in the federal courts" and

collecting "affidavits . . . giving specific rate information, supporting and substantiating the rates described." First Rezneck Affidavit ¶ 9, *Laffey v. Northwest Airlines, Inc.*, No. 1:70-cv-02111-AER (D.D.C. Mar. 17, 1983), Joint Appendix ("J.A.") 571–72. A star was born. *See Eley*, 793 F.3d at 100 (describing the *Laffey* matrix as "[t]he most commonly used fee matrix" in this circuit "for lawyers who practice 'complex federal litigation'").

We endorsed the *Laffey* matrix in *Save Our Cumberland Mountains, Inc. v. Hodel*. Sitting en banc, we "commend[ed] its use for the year to which it applie[d]" and suggested "the compiling of a similar schedule of prevailing community rates for other relevant years." *Cumberland Mountains*, 857 F.2d at 1525. Joseph Yablonski, a Washington, D.C. litigator, answered that call by speaking "with attorneys from" seven major law firms and comparing the rates he "found with the rates set forth in two broad-ranging surveys of hourly rates published in the *National Law Journal*." Yablonski Declaration ¶¶ 5–6, *Broderick v. Ruder*, No. 1:86-cv-01834-JHP (D.D.C. 1989), J.A. 624–25. Yablonski's labors updated *Laffey*'s rates through 1989. Somewhat confusingly, litigants routinely refer to both the original 1983 matrix and Yablonski's 1989 update as the "*Laffey* matrix."

In the following decades, hourly rate disputes in this circuit often revolved around whether a case was sufficiently complex to warrant *Laffey* rates, *see, e.g.*, *Reed*, 843 F.3d at 525–26 (addressing that question in an IDEA case), and, if so, how best to update the *Laffey* matrix for inflation, *see Eley*, 793 F.3d at 101 (describing that debate). The USAO maintained one version of the matrix, relying on the original 1983 base data updated through a Bureau of Labor Statistics inflation index that tracks regional price increases in all goods. *Id.* Some plaintiffs' attorneys argued that this index failed to capture the

true rate of inflationary change and began advancing a version of the 1989 *Laffey* data updated with a different Bureau of Labor Statistics index called the Legal Services Index (LSI), which estimates price increases for the legal market nationwide. *Id.* at 101–02. When the two were pitted against each other, courts frequently found the LSI *Laffey* matrix more persuasive. *See id.* (observing that "critics" of the USAO's *Laffey* matrix had "advocated, to some degree of success, for a competing *Laffey* Matrix . . . that uses the Legal Services Index"); *see also Salazar v. District of Columbia*, 809 F.3d 58, 65 (D.C. Cir. 2015) (affirming district court's choice to apply the LSI *Laffey* matrix over the USAO's).

Since 2015, however, the USAO has undertaken a major effort to replace the *Laffey* datasets by using a more current rate survey as the base for a brand new matrix. For those figures, the USAO turned to the annual Survey of Law Firm Economics, published by ALM Legal Intelligence ("ALM") in conjunction with the *National Law Journal*. The off-the-rack version of that survey publishes hourly rate data for thousands of lawyers engaged in all types of practice, all over the country. The USAO custom ordered a subset of the 2011 survey's data covering the "Washington, D.C. metro area," defined by the Census Bureau to include portions of Virginia, Maryland, and West Virginia. Plaintiffs' Exhibit 84, *DL v. District of Columbia*, 1:05-cv-01437-RCL, ECF No. 566-17 (D.D.C. May 21, 2017), J.A. 1573. This tailored dataset summarizes "standard hourly billing rates" for 350 attorneys, yielding average rates hundreds of dollars below those reflected in the LSI *Laffey* matrix. *Id.* The USAO intends to update ALM's 2011 data for inflation using still another index focusing on industry-specific price increases nationwide.

**B.**

This case began almost fifteen years ago when plaintiffs,

parents of several children aged three to six, filed suit "alleging a 'pervasive and systemic' breakdown in the" District of Columbia's compliance with IDEA resulting from the District's failure "to identify large numbers of disabled children and delivering inadequate and delayed [educational] services to many others." *DL v. District of Columbia*, 860 F.3d 713, 718 (D.C. Cir. 2017). Following a protracted dispute regarding class certification resulting in two separate trips to this court, extensive motions practice, and two separate bench trials, "the district court issued a 130-page opinion finding the District liable" on most counts and ordered sweeping injunctive relief. *Id.* at 719–20. We affirmed "in all respects." *Id.* at 717.

As plaintiffs had prevailed on the majority of their claims, fee litigation commenced. Although the parties contested many issues in the district court, all but the hourly rate have dropped out on appeal. Plaintiffs sought attorney fees based on the LSI version of the *Laffey* matrix. The District offered the new USAO matrix as an alternative. Both sides produced a pile of evidence purporting to prove that their matrix better reflects the relevant rates, including affidavits from economists and attorneys; various commercially-available rate surveys; and information regarding fees requested, awarded, and settled on in other cases.

The district court began by finding that both matrices were "presumptively" applicable to "complex federal litigation." *DL v. District of Columbia*, 267 F. Supp. 3d 55, 69 (D.D.C. 2017). Comparing the two, however, the court was more persuaded by the USAO's new matrix, especially its statistically significant sample size and "more narrowly defined" experience categories. *Id.* at 69–70. Thus, despite plaintiffs' objection that the data underlying the USAO's new matrix incorporates rates for non-litigators outside the District, the court ordered plaintiffs to recalculate their fees using the USAO's rates. *Id.*

at 72. Largely as a result of that order (in conjunction with a few minor adjustments unchallenged on appeal), the requested $9.76 million fee dropped to a $6.96 million award. Plaintiffs appeal.

## II.

Simply stated, the question before us is whether the district court abused its discretion in determining that the hourly rates in the USAO's matrix are "reasonable." Recall that IDEA makes express a requirement that inheres in any statutory provision for "reasonable attorney's fees": such fees must be calculated using "rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415(i)(3)(C); *accord Blum*, 465 U.S. at 895 n.11 (explaining that this is part of what it means to be "reasonable"). Recall also that once "a fee applicant" has met the preliminary burden of "justifying the reasonableness of the rates," those rates are "presumed to be . . . reasonable" unless and until the defendant offers "equally specific countervailing evidence" supporting another rate. *Covington*, 57 F.3d at 1107, 1109 (internal quotation marks omitted). We will reverse a district court's determination that certain hourly rates are reasonable when there has been a "clear misapplication of legal principles, arbitrary fact finding, or unprincipled disregard for the record evidence." *Kattan ex rel. Thomas v. District of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993), *as amended* (June 30, 1993); *see also Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law.").

## A.

We begin with the District's argument that plaintiffs failed to meet their initial burden to support with specific evidence

their claim that the LSI *Laffey* rates satisfy the statute's command. Our recent opinion in *Salazar v. District of Columbia*, however, all but compels the conclusion that plaintiffs cleared that bar. The *Salazar* plaintiffs relied on the same types of evidence in essentially the same level of detail to support the same rate matrix (for a slightly earlier year). 809 F.3d at 64–65. That evidence, we concluded, was more than enough to pass the burden onto the District. *Id.* at 65 ("With these numbers and submissions in the record, the district court's point that the LSI-adjusted matrix is probably a *conservative* estimate of the actual cost of legal services in this area, does not appear illogical." (internal quotation marks omitted)). The District has given us no reason to reach a different conclusion on such a similar record.

**B.**

The meatier question, then, is whether the District satisfied its rebuttal burden. The USAO's new matrix formed the cornerstone of the rebuttal case, and the district court treated that matrix as "presumptively" applicable. *DL*, 267 F. Supp. 3d at 69. We are at a loss to understand the basis of that presumption, given that this court had yet to review the new matrix. The proper inquiry, under the applicable legal principles, was whether the District supported its matrix with "equally specific countervailing evidence." *Covington*, 57 F.3d at 1109 (internal quotation marks omitted).

The District contends that the USAO's more recent raw data and statistically significant sample size make its matrix superior to plaintiffs' favored LSI *Laffey* matrix. Crucially, however, those traits matter only if the data surveys the relevant population. As plaintiffs' expert, Dr. Michael Kavanaugh, put it, "comparable prices are found by observing comparable goods." Second Kavanaugh Declaration ¶ 8, *DL v. District of Columbia*, 1:05-cv-01437-RCL, ECF No. 566-11

(Apr. 26, 2017), J.A. 1380. For example, for someone house hunting in Memphis, a survey of real estate prices in Seattle—even one with a perfect response rate updated daily—would be of no use. The same is true here. The USAO's matrix is helpful only if it canvasses the relevant type of lawyer, which it does not.

To begin with, the USAO's matrix incorporates rates for the wrong types of practitioner. The parties and the district court agree that this case qualifies as "complex federal litigation." *DL*, 267 F. Supp. 3d at 69. Yet rather than confine its data to rates charged by attorneys practicing that genre of litigation—or even just litigators in general—the survey that the USAO drew from incorporates rates from *all* types of lawyers. Respondents include real estate lawyers, family lawyers, and insurance lawyers—lawyers manifestly not offering "the kind and quality of services furnished" by these plaintiffs' attorneys, as the statute requires of comparators. 20 U.S.C. § 1415(i)(3)(C); *accord Eley*, 793 F.3d at 105 (fee analysis should focus on "lawyers . . . doing the same type of litigation" (emphasis omitted)). It is obvious that the rates charged for, say, simple wills are lower than those for complex federal litigation. Worse still, nothing in the record reveals what percentage of respondents in the USAO's custom cross-section of the ALM data were litigators. For all we know, the number could be anywhere from zero to all 350.

Compounding this first error, the USAO's custom-ordered dataset surveys lawyers far beyond the "community in which th[is] action . . . arose." 20 U.S.C. § 1415(i)(C)(3). Plaintiffs brought this case on behalf of District of Columbia residents regarding District of Columbia schools against the District of Columbia. Yet the USAO matrix draws from lawyers who practice in the entire "metro area" as defined by the United States Census Bureau. The phrase "metro area" suggests

proximity, but—according to the Census Bureau's definition—that area stretches well beyond the District to cover thousands of square miles over three states, from rural Madison County, Virginia, to the eastern shore of Maryland, back to the foothills of Jefferson County, West Virginia. Needless to say, this case has no connection to most of those areas. Our court has held that ordinarily "the relevant community is the one in which the district court sits." *Donnell v. United States*, 682 F.2d 240, 251 (D.C. Cir. 1982). Accordingly, our decisions refer to the relevant community as the District of Columbia. *See, e.g.*, *Salazar*, 809 F.3d at 64 (discussing "prices for legal services in Washington, D.C."); *Covington*, 57 F.3d at 1104 (discussing evidence of rates "in the District of Columbia"). That general rule fits comfortably with the facts of this case. Yet here, more than half the data in the USAO's customized dataset comes from outside the District of Columbia, *see* Appellant's Br. 20, and District counsel acknowledges that it includes data from *throughout* the three neighboring states, *see* Oral Arg. Rec. 28:04–28:22. Again, it is obvious, as District counsel recognizes, that fees are lower in rural areas than in the District. *See* Oral Arg. Rec. 31:04–31:30. Indeed, the District's own evidence shows that rates for legal services in the District of Columbia are among the highest anywhere. National Law Journal & ALM Legal Intelligence, *The Survey of Law Firm Economics*, 139–41 (2011 ed.), J.A. 1485–87.

Confronted with these two flaws, the district court said nothing about them, resting exclusively on its statement that the USAO's matrix was "presumptively applicable." *DL*, 267 F. Supp. 3d at 69. In doing so, the court abused its discretion twice over. First, by failing to determine whether the USAO's matrix satisfies Congress's statutory baseline, the court committed a "clear misapplication of legal principles." *Kattan*, 995 F.2d at 278; *see also Koon*, 518 U.S. at 100. And second,

it "disregard[ed] . . . record evidence" that its chosen matrix failed to achieve that baseline. *Kattan*, 995 F.2d at 278.

Calling in reinforcements, the District points to a growing consensus among the district judges in this circuit that the USAO matrix is superior to *Laffey*. *See, e.g.*, *Lewis v. District of Columbia*, No. 1:15-cv-521-JEB, 2018 WL 6308722, at *8 (D.D.C. Dec. 3, 2018) (collecting cases). Many of those cases repeat the district court's fundamental error here: none finds, based on record evidence, that the new matrix is based on rates for complex federal litigators in the District. *See id.* at *9 (no response to the plaintiff's objection that the new USAO matrix "reflects all types of legal services"); *Gatore v. United States Department of Homeland Security*, 286 F. Supp. 3d 25, 42–43 (D.D.C. 2017) (no response to observation that the USAO's survey may be "over-inclusive"); *Electronic Privacy Information Center v. United States Drug Enforcement Administration*, 266 F. Supp. 3d 162, 170–71 (D.D.C. 2017) (no discussion of survey composition); *Clemente v. Federal Bureau of Investigation*, No. 1:08-cv-1252-BJR, 2017 WL 3669617, at *5 (D.D.C. Mar. 24, 2017) (merely describing the new USAO matrix as "measur[ing] rates in the legal services industry"). Others apparently lacked the benefit of any briefing on the new matrix's flaws. *See, e.g.*, *Wadelton v. Department of State*, No. 1:13-cv-412-TSC, 2018 WL 4705793, at *12 (D.D.C. Sept. 30, 2018) (adopting new USAO matrix *sua sponte* "[a]lthough the parties ha[d] not briefed" it); *National Security Counselors v. Central Intelligence Agency*, No. 1:11-cv-444-BAH, 2017 WL 5633091, at *17 (D.D.C. Nov. 21, 2017) (employing the new USAO matrix after plaintiffs offered "no analysis of the USAO's newest methodology"). So, even sympathizing with the district court's appetite for more recent data, we are unpersuaded by its decision to embrace newer but irrelevant figures.

Despite the evidentiary defects in the record, the District offers an alternative basis for affirming: its supplemental proof demonstrates that the USAO's matrix accurately reflects complex litigation rates in the District of Columbia. But the district court made no findings about the evidence the District uses to back up that claim, and some of that data appears to be of dubious value. For example, the District's primary redoubt comprises two sets of nationwide data from the 2014 ALM survey. But it is not at all obvious that these *nationwide* datasets are useful comparators for rates in the District. *See* National Law Journal & ALM Legal Intelligence, *The Survey of Law Firm Economics* 139–41 (2011 ed.), J.A. 1485–87 (showing that rates in the District substantially exceed those in most other jurisdictions). Nonetheless, mindful of the district court's primary factfinding role, we leave it for that court to assess on remand the impact, if any, of the District's remaining market evidence and to take further evidence if necessary to arrive at a "reasonable rate."

## C.

The District argues that "even if" we reject the USAO's new matrix—as we now have—"that does not mean that [plaintiffs] were entitled to rates under the LSI [*Laffey*] Matrix." Appellee's Br. 25. But it offers one and only one argument for rates in between the two: that this court has held that attorneys in IDEA cases should not be compensated at *Laffey* rates. *Id.* That argument mischaracterizes our precedent. True, we have held that IDEA cases *sometimes* fall within a submarket characterized by below-*Laffey* rates. *Reed*, 843 F.3d at 525. But such cases involved individual IDEA plaintiffs litigating non-complex cases primarily before an administrative body. *See id.* (noting individual "IDEA litigants may not have discovery and pre-trial exchanges of the sort found in other federal litigation"); *Eley*, 793 F.3d at 105 n.6 (discussing "representation in IDEA administrative due

process hearings" (internal quotation marks omitted)); *accord* Second Kohn Affidavit ¶¶ 9–17, No. 1:05-cv-01437-RCL, ECF No. 566-5 (D.D.C. Apr. 27, 2017), J.A. 1359–61 (describing typical IDEA case and noting that, "in an even unusually complex individual IDEA case appealed to the district court," the "full record . . . would typically fit into two banker's boxes"). Indeed, we have always left open "the possibility that . . . fee applicants may be able to demonstrate that IDEA cases are 'complex federal litigation' to which the *Laffey* Matrix presumptively applies." *Reed*, 843 F.3d at 525. And here the district court found that this case qualifies as "complex federal litigation," *DL*, 267 F. Supp. 3d at 69, a finding the District has not challenged, *see* Appellee's Br. 22 n.8. It therefore may not claim that fees from individualized IDEA actions are appropriate comparators.

To be sure, the district court identified other concerns regarding the LSI *Laffey* matrix, including (1) the age of the raw data; (2) whether it captures a truly representative sample of complex federal litigators; and (3) the grouping of attorneys into just five experience bands. *DL*, 267 F. Supp. 3d at 69–70. These observations suggest that as time passes, the *Laffey* matrix may well—like shoulder pads, eight-tracks, and other '80s fads before it—be losing its shine. In this particular case, however, the District raised no argument that these issues justify rates somewhere between the two matrices. *See* Appellee's Br. 25. Therefore, it has forfeited any such contention. *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief.").

## D.

One last issue remains: the rates for plaintiffs' only lawyer who regularly bills fee-paying clients, Cyrus Mehri. We see no reason why the rates that apply to the rest of plaintiffs' lawyers

would yield inadequate compensation for Mehri's services. Plaintiffs contend that Mehri is instead entitled to his usual billing rate, but his sparse affidavit tells little about whether his relatively minimal contributions to the case differ sufficiently from his colleagues' to warrant a different methodology. Mehri Affidavit, No. 1:05-cv-01437-RCL, ECF No. 537-17 (Sept. 26, 2016), J.A. 428–29 (asserting he "did work related to class certification" and tried to "broker a resolution to this case"). As *Eley* instructs, the focus is properly on the market rate "charged by for-profit lawyers" for "*the same type of litigation*." 793 F.3d at 105. And although stating in his affidavit that he charges the same rate no matter what type of work he performs, Mehri nowhere represents that a client on the market would hire him at that rate for the types of services he performed in this case. Accordingly, the district court did not abuse its discretion by compensating Mehri using the same method as his co-counsel.

## III.

Not so long ago, the prevailing belief was that parties would often be able to agree on reasonable attorney's fees. *See Hensley*, 461 U.S. at 437 ("Ideally, of course, litigants will settle the amount of a fee."). We regret that this prophecy has gone unfulfilled and fervently hope that practitioners in this circuit—on both the plaintiff and defense sides of the bar—will work together and think creatively about how to produce a reliable assessment of fees charged for complex federal litigation in the District. In the meantime, however, we must discharge our duty to ensure that the adversarial alternative produces results that respect Congress's mandates. Because the fee award in this case falls short of that goal, we vacate it and remand for further proceedings consistent with this opinion.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, dissenting: Ambrose Bierce defined a lawyer as "[o]ne skilled in circumvention of the law." Ambrose Bierce, The Unabridged Devil's Dictionary 147 (Univ. of Georgia Press 2000). Though I do not suggest that this is an accurate description, I nonetheless would observe that the jurisprudence of IDEA litigation attorney-fee awards well establishes that lawyers and jurists are professionals skilled in complicating the law. The jurisprudential odyssey on this sea began with a rather straightforward mandate from Congress in 20 U.S.C. § 1415(i)(3), a subsection headed "Jurisdiction of *district* courts; attorney fees." (Emphasis added.)

More specifically, Congress provided that, "[i]n any action or proceeding brought [under the IDEA provision providing judicial relief], the court, in its discretion, may award reasonable attorneys' fees as part of the costs." 20 U.S.C. § 1415(i)(3)(B)(i). While the following subsections provide some limitations and directions for the computation of the award, the basic task created by Congress and placed within the jurisdiction of the district court is a factual determination of the reasonableness of attorneys' fees to be awarded as part of the costs in IDEA actions. The congressional language would seem to rather straightforwardly call for findings of fact, concerning the reasonableness of attorneys' fees to be awarded. The district court in the present controversy made such findings which we are now called upon to review.

"[T]he standard governing appellate review of a district court's finding of [facts] is that set forth in Federal Rule of Civil Procedure 52(a)." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). Rule 52(a) provides that "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous . . . ." Not only would it seem apparent that this is the standard of review we should be applying to the issues before us, it seems especially appropriate where the question is expressly described as within the "jurisdiction of

district courts" in the enactment creating the right to such a finding.  20 U.S.C. § 1415(i)(3).

Indeed, we have expressly held in previous IDEA class litigation that "[w]e review the district court's fee award for abuse of discretion, and will not upset its hourly rate determination absent clear misapplication of *legal* principles, arbitrary factfinding, or unprincipled disregard for the record evidence." *Eley v. District of Columbia*, 793 F.3d 97, 103 (D.C. Cir. 2015) (emphasis added) (internal quotation marks and citations deleted).  In spite of this standard, in the present case, the majority reviews the district court's determination of the factual questions before us, not for compliance with Rule 52(a), nor for abuse of discretion, but as if it were a question of law.

The majority asks not whether the district court committed a clear misapplication of legal principles, or arbitrary factfinding, or unprincipled disregard for record evidence, but rather whether the district court's findings of fact fit within a detailed grid, the *Laffey* Matrix, which might be construed as a proffer by the prevailing party for findings of fact, but more closely resembles a detailed regulation adopted by some government agency after an appropriate period of notice and comment.

The district court found another matrix to be more factually appropriate.  The making of that factual determination, under the law in general and under the governing statute in particular, is the district court's province.  I grant that we as an appellate reviewing court have participated in the establishment of this legislation-like matrix.  I further realize that we have the authority to establish precedent binding upon district courts and upon panels of this court such as this one. *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc).  Nonetheless, I

have always understood our authority to make binding precedents to govern matters of law, not findings of fact. The present controversy concerns a matter of fact. This, under the binding precedent of both this circuit and the Supreme Court and the Rules of Civil Procedure is within the discretion of the district court, subject only to the limited review described above.

While not necessary to my dissent, I further note that appellants proffered nothing to convince me that the LSI Matrix preferred by them is inherently more appropriate for the findings required by the district court in this case than the USAO Matrix relied upon in the district court's findings. Appellants' argument rests on the proposition that the award should have been based on fees determined by survey of a specific subcategory of attorneys out of the several set forth in their preferred matrix: specifically, practitioners in complex federal litigation in Washington, D.C. The matrix employed by the district court instead considered the rates of a broader sampling of attorneys from a broader geographic area, including not only the District of Columbia, but also adjacent portions of three states. It is not apparent how this was an abuse of discretion of the sort that would make the court's determination reversible under the standard set forth in the rules and blessed in *Anderson v. Bessemer City*, and a multitude of other cases.

Appellants seem to argue that the district court's determination was inconsistent with Congress's instructions in section 1415(i)(3)(C). That section mandates that an IDEA fee award "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." It does not mandate that the community should be limited to a "community" defined as only the largest municipality in a region, or to the highest priced professional practicing in that limited community.

4

As the purpose of Congress in setting forth the general limitations of subsection (C) appears to encourage the determination of a market for assessing the reasonableness of fees, it would seem that an analysis of the fitness of either matrix to that determination could, without violating the standard under which we review factfinding, include reflecting on the reasonableness of persons obtaining legal representation in such a hypothetical market. It might be that those persons would choose the most expensive professionals for the most expensive part of the market. While such conduct might not be unreasonable, neither is it inherently unreasonable that they might choose a less imposing or less expensive attorney who is nonetheless trusted and competent to do the work in the case. It may shock counsel before us to learn, but it is not necessary in every case to have the most specialized or the most expensive counsel in order to receive competent legal services. In any event, it is not arbitrary fact finding for the judge to conduct an analysis of the evidence that is consistent with such supposition. In short, I find no abuse of discretion or other reversible error.

My colleagues disagree. I respectfully dissent.